IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. RAY SANCHEZ TOPASNA,<br><br>Plaintiff,<br><br>v.<br><br>MARK S. SMITH, in both his official and personal capacities,<br><br>Defendant. | Case No. 1:15-cv-00040<br><br>**DECISION AND ORDER GRANTING IN PART UNITED STATES' MOTION FOR SUMMARY JUDGMENT; AND DENYING SMITH'S CROSS MOTION FOR SUMMARY JUDGMENT** |

## I. INTRODUCTION

This qui tam action arises under the False Claims Act and is brought by Plaintiff United States on behalf of the United States Department of Housing and Urban Development ("HUD") for claims of fraud involving the Guam Housing and Urban Renewal Authority's ("GHURA") administration of the Housing Choice Voucher ("HCV") program, also known colloquially as the Section 8 program. (*See generally* US Compl., ECF No. 55.) The United States has pled an unjust enrichment claim in the alternative. (*Id.* at 13; US' Opp'n 14 n.20, ECF No. 130.) HUD oversees the Section 8 program. (US' MSJ 5, ECF No. 121.) HUD, through the Section 8 program, provides public housing agencies ("PHA") with federal funds to make housing assistance payments ("HAP payments") on behalf of tenants so that they may rent qualified privately-owned housing of their own selection. (US' MSJ 6 (citing 42 U.S.C. § 1437f; 24 C.F.R. Part 982).) GHURA is Guam's PHA—a "State, county, municipality, or other governmental entity or public body . . . which is authorized to engage in or assist in the development or operation of public housing . . . ." *See* 42 U.S.C. § 1437a(b)(6). Defendant Mark Smith owned

multiple rental properties and participated as a landlord in HUD's Section 8 Program before, during, and after his employment as legal counsel for GHURA.

Before the Court are Plaintiff United States' and Defendant Mark Smith's cross-motions for summary judgment, fully briefed.[1] The United States argues that Smith maintained an impermissible conflict of interest between 2011 to 2014 while he was **either** a Section 8 landlord **or** otherwise held interests in Section 8 rental properties and payments, due to his role and actions as GHURA's legal counsel. (US' MSJ 5, 27.) The United States contends this conflict of interest, prohibited by federal regulation at 24 C.F.R. § 982.161, applied to the HAP contracts and Smith's legal services contract with GHURA. (*Id.* at 27–28.) Accordingly, the United States seeks to recover treble damages under the False Claims Act on the basis of forty-seven (47) total false claims, with the value of $1,729,950. (*Id.* at 5.) Forty (40) of the false claims are HAP payments—fourteen (14) made directly to Smith and twenty-six (26) made to Glenn Wong, his alleged "strawman"—between 2011 to 2014. (*Id.* at 5, 27.) Seven false claims are legal fees bills paid for that Smith received as GHURA's contracted legal counsel. (*Id.* at 5.) Lastly, the United States seeks the maximum penalty amount for each of the 47 false claims in addition to two conspiracy violations of the False Claims Act—deceptive property transfers or strawman schemes in 2011 and 2012 through which Smith conspired with Wong to conceal Smith's interests in the HAP payments which constituted his conflict. (*Id.*) The total penalty amount sought for these forty-nine (49) violations is $539,000. (*Id.* at 39.) Altogether, the United States requests that the Court enter judgment in its favor in the amount of $2,268,950, with costs and pre- and post-judgment interest. (*Id*. at 41.)

---

[1] The United States filed its motion for summary judgment (US' MSJ, ECF No. 121); Smith filed his opposition (Smith's Opp'n, ECF No. 128), to which the United States replied (US' Reply, ECF No. 132).

Smith filed his motion for summary judgment (Smith's MSJ, ECF No. 127); the United States filed its opposition (US' Opp'n, ECF No. 130), to which Smith replied (Smith's Reply, ECF No. 134).

Smith on the other hand, argues the United States' complaint in intervention in this qui tam action is barred because the United States has already chosen to seek civil penalties and assessments against Smith in administrative proceedings. (Smith MSJ 8); *see also Smith v. U.S. Dept. of Housing and Urban Development*, Case No. 25-cv-00016 (petition for review of administrative proceedings). Smith also argues that all of the United States' claims fail because he was not a "covered individual" as defined in the HAP contracts and the regulation; and alternatively, there was no false claim to support the claims based on the legal services payments. (Smith MSJ 9.) Furthermore, Smith contends the alleged false representations were not material under the False Claims Act, nor are there any legally cognizable damages, and any penalties must be limited and offset as a matter of law. Finally, Smith claims the two conspiracy claims are barred by the statute of limitations and further seeks a denial of the United States' claim for unjust enrichment.

After considering the parties' briefs, exhibits, oral argument, and the applicable law, the Court now GRANTS IN PART the United States' motion for summary judgment as to the False Claims Act causes of action in Count I (Presentation of False Claims), Count III (Making or Using False Records or Statements), and Counts V, VI (Conspiracy to Commit a Violation under the FCA); and DENIES Smith's motion for summary judgment as to these same claims and Count VI (Restitution (Unjust Enrichment)) for the following reasons.

## II. FACTUAL BACKGROUND

The facts below are derived from the parties' undisputed facts (US' MSJ 6–24; Smith's Opp'n 6–9; Smith's MSJ 6–8; US' CSMF, ECF No. 122; Smith's Opp'n CSMF, ECF No. 129; Smith's CSMF, ECF No. 127-4), which are based on numerous declarations and exhibits, submitted primarily by the United States (ECF No. 122-1 (US' Table of Exs.); ECF Nos. 124-1 to 124-269, 126-1 to 126-44, 127-1 to 127-3, 130-1 to 130-2). To the extent that a fact was not

explicitly identified as disputed or undisputed, the Court treats the fact as undisputed for the purposes of the motion pursuant to Rule 56(e) of the Federal Rules of Civil Procedure.[2] Where a part of a fact is disputed, the Court notes as such.

**A. Section 8 program and HAP contracts**

Section 8 property owners, such as Smith, enter into lease agreements with tenants under the HCV Program. (*See, e.g.*, Ogo Lease and HAP Contract 1 Tenancy, ECF No. 124-2.) The property owners also enter into HAP contracts directly with GHURA to receive HAP payments made by GHURA on behalf of tenants. (*See e.g.*, *Id.* at 2–12.) HAP contracts contain a conflict-of-interest provision prohibiting "covered individuals" from having "any direct or indirect interest in the HAP contract or in any benefits or payments under the contract (including the interest of an immediate family member of such covered individual) while such person is a covered individual or during one year thereafter." (US' CSMF ¶ 3; *see, e.g.*, Ogo Lease and HAP Contract ¶ 13.b.) As relevant to this case, a covered individual is defined as "a person or entity who is . . . [a]ny employee of the PHA, or any contractor, sub-contractor or agent of the PHA, who formulates policy or who influences decisions with respect to the program[.]" (US' CSMF ¶ 3; *see, e.g.*, Ogo Lease and HAP Contract ¶ 13.a.) Under the terms of each HAP contract, "[u]nless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract." (*See, e.g.*, Ogo

---

[2] Smith's opposition concise statement of material facts (ECF No. 129) does not address each fact in the United States' statement (ECF No. 122) because Smith argues the unaddressed facts are not "absolutely necessary to determine the issues presented in the summary judgment motion." (Smith's Opp'n CSMF 1.) At the same time, Smith states that he "does not concede the accuracy" of the unaddressed facts. (*Id.*)

Under FRCP 56(e), "[i]f a party fails to . . . properly address another party's assertion of fact . . . , the court may . . . consider the fact undisputed for purposes of the motion[.]" Further, under Guam Civil Local Rule 56(g), "[f]or purposes of a motion for summary judgment, material facts set forth in the moving party's concise statement will be deemed undisputed unless controverted by a separate concise statement of the opposing party." Thus, the Court treats material facts unaddressed by Smith as undisputed facts.

Lease and HAP Contract ¶ 7.b.) HUD regulations also contain the same prohibition against covered individuals from entering into "any contract or arrangement in connection with the HCV program." (US' CSMF ¶ 3; 24 C.F.R. § 982.161.) If a prohibited interest in the HAP contract occurs, the HAP contract requires the owner to promptly and fully disclose such interest to GHURA and HUD. (US' CSMF ¶ 33; *see, e.g.*, Ogo Lease and HAP Contract ¶ 13.e.) Lastly, both the HAP contracts and HUD regulations contain waiver provisions: "[t]he conflict of interest prohibition under this section may be waived by the HUD field office for good cause." (*See* Smith's CSMF 1; Ogo HAP Contract ¶ 13.f.; 24 C.F.R. § 982.161(c).)

From May 2000 until at least May 2002, Smith served as principal legal counsel to GHURA. (US' CSMF ¶ 11 (unaddressed by Smith).) At that time, Smith was not a Section 8 owner. (*Id.*)

### B. Waiver Request for GHURA's Prior Legal Counsel David Lujan

#### 1. 2003 Lujan Letter and GHURA Action

On May 5, 2003, GHURA's legal counsel—David Lujan—disclosed to GHURA's Executive Director that he had an ownership interest in Section 8 rental units. (US' CSMF ¶ 12; 2003 Lujan Letter, ECF No. 124-42.) Citing "24 CFR 982.161(a)(2) and the HAP Contract, Part B, Paragraph 13," Lujan wrote "to disclose certain potential conflicts" he might have based on 1) his wife's personal ownership interest in Section 8 properties; 2) his wife's shareholder status in Ark Investment Corp., which provides Section 8 housing; and 3) both his and his wife's majority shareholder status in D & A Inc., which provides Section 8 housing. (2003 Lujan Letter; *see* Smith's CSMF 2 (undisputed regarding language in letter).) In it, Lujan requested "a waiver be obtained as to this potential conflict pursuant to 24 CFR 982.161(c)." (Lujan Letter; *see* Smith's CSMF 2.) The May 8, 2003 meeting minutes of the GHURA Board of Commissioners ("BOC") reflects the BOC's recommendation "that the Executive Director send a letter to the

HUD Office to request for a waiver" on behalf of Lujan. (BOC Mins. May 8, 2003 10, ECF No. 124-43.) The BOC's recommendation was made after it was informed that the federal regulation requires the BOC to seek a waiver from HUD if GHURA has reason to believe Lujan is a covered individual. (*See id.*) Executive Director Ron De Guzman subsequently addressed a letter to Michael Flores, of HUD's Honolulu Field Office, on the subject of "Conflict of Interest Ruling & Waiver." (2003 De Guzman Letter, ECF No. 124-45.) In the letter, De Guzman informed HUD that at GHURA's BOC meeting, the BOC classified Lujan along with two other individuals as "covered individuals" and therefore sought a waiver from HUD to allow him to continue as a Section 8 landlord. (*Id.*) GHURA sought advice from HUD based on Lujan's disclosure of his interests in several Section 8 HAP contracts, and provided the additional information that Lujan occasionally attends BOC meetings but Anthony Perez, from Lujan & Perez LLP, is GHURA's primary legal counsel. (*Id.* at 1; 2003 Lujan Letter; *see* Taitano 2013 Emails to Bordallo 3, ECF No. 124-44.) HUD received this letter as shown by certified mail receipt. (*See id.* at 3.) De Guzman's letter itself is not stamped as received by HUD. (*See id.*)

Several years later, on January 23, 2007, Millie Taitano—a GHURA employee—sent two emails to Michael Flores following up about the 2003 waiver request for Lujan, in addition to other individuals. (*See* Jan. & Feb. 2007 HUD & GHURA Emails 1, 3–4, ECF No. 124-46.) Flores forwarded Taitano's email to other HUD employees, asking whether anyone knew about the waiver requests and communicating that he did not see any waiver requests after reviewing the mail log going back to October 2006. (*See id.* at 3.) Darlene Kaholokula—a HUD employee—initially responded stating she did not receive any waiver requests. (*See id.* at 2–3.) On February 14, 2007, Kaholokula sent another email addressed to Flores. (*Id.* at 2.) She describes that a week earlier, when she was in Guam, a GHURA employee "secretly gave [her] a copy of one of the conflict of waiver [sic] requests for David Lujan (referenced in Millie's

email message below).” (*Id.*) Kaholokula’s email further recognizes that Lujan’s letter is dated May 5, 2003, and that she communicated to GHURA staff that her acceptance of the letter “did not indicate that HUD approved the request for waiver or acknowledge receipt of the original letter.” (*Id.*) Lastly, Kaholokula’s email states GHURA staff informed her “the reason why [she] was given a copy [of the letter] was because when Ron de [sic] Guzman was asked about the status of the waiver request (if GHURA received HUD’s approval), Ron de Guzman’s response was to continue paying the HAP to Mr. Lujan.” (*Id.*)

On March 13, 2007, Flores sent a letter to De Guzman, alerting him of the 2003 Lujan Letter received by HUD staff the week of February 5, 2007. (Mar. 2007 Flores Letter 1, ECF No. 124-47.) Flores’s email also highlights that attached to the Lujan Letter was a statement, attested to by De Guzman “as Secretary/Executive Director of GHURA,” stating: “Approved by the Board of Commissioners in the Regular Meeting of May 8, 2003, concurred as a covered individual and recommending the contract be continued, however, a letter be sent to HUD requesting for the waiver. Motioned by Chairman Rufo Taitano, seconded by Commissioner Benny Pinaula, and unanimously agreed.” (*Id.*) Both the 2003 Lujan Letter and De Guzman’s signed statement of approval are attached to the email. (*Id.* at 3–4.) Flores further summarized that after receiving an email from Taitano following up on the waiver request from HUD, Flores responded he did not know of any pending waiver request and “asked when the request was sent and was it sent as part of another package[,]” to which Flores never received a response. (*Id.*) Lastly, Flores provided a deadline of March 31, 2007 for GHURA to respond about whether “GHURA has approved the participation of covered individuals in the Section 8 Housing Choice Voucher program without obtaining a waiver of the conflict of interest provision . . . .” (*Id.* at 2.)

//

//

**2. 2007 GHURA Waiver Request for Lujan**

On December 31, 2007, Flores sent another letter to De Guzman, this time "in response to [De Guzman's] letter dated March 23, 2007 and subsequent correspondence by letter and e-Mail requesting [HUD's] waiver of the conflict of interest provision of 24 Code of Federal Regulation 982.161 for Mr. David Lujan, Lead Counsel for the law firm representing [GHURA]" and for other individuals. (Dec. 2007 Flores Letter 1, ECF No. 124-50.) Further, Flores noted the requirements for a waiver request, including the submission of a local attorney's opinion regarding Lujan's HAP contracts and Lujan's compliance with Guam law. (*See id.* at 2.) Flores acknowledged receipt of the legal opinion provided by Mr. Rawlen Mantanona on April 30, 2004. (*Id.*) Finally, Flores's letter stated "we will not recommend a waiver of the conflict of interest provision" for Lujan and others. (*Id.*) The letter specified:

> As lead counsel of the law firm that represents GHURA, Mr. Lujan would likely be covered by regulation as a contractor or agent of GHURA. Furthermore, although Mr. Lujan is not the attorney at the firm who is primarily responsible for representing GHURA, he occasionally attends GHURA Board meetings, has attended at least one meeting with Department of Housing and Urban Development (HUD) officials and has written letters to HUD as attorney for GHURA, and likely would be able to influence decisions with respect to the Section 8 Housing Voice Voucher program. . . . GHURA has not demonstrated good cause (i.e., benefit to the program or the families) to support the waiver request. . . . Please confirm by letter the status of the HAP contracts between GHURA and Mr. Lujan or his wife.

(*Id.* at 2–3.) At the end of the letter, Flores wrote: "Please note that this letter does not address at this time whether or not GHURA is required to reimburse the Section 8 program for entering into HAP contracts where a conflict of interest existed. We will address that matter after receiving the information we request in this letter." (*Id.* at 5.)

After HUD received the requested information from De Guzman regarding the status of the thirty-five (35) HAP contracts between GHURA and Lujan (including Lujan's wife and their companies) (*see* Jan. 2008 De Guzman Letter, ECF No. 124-48), Flores wrote back to De

Guzman with substantially similar comments about Lujan's conflict as those already communicated in Flores's December 2007 letter:

> As lead counsel of the law firm that represents GHURA, we advised you that Mr. Lujan would likely be covered by regulation as a contractor or an agent of GHURA. Furthermore, although Mr. Lujan is not the attorney at the firm who is primarily responsible for representing GHURA, he occasionally attends GHURA Board meetings, has attended at least one meeting with Department of Housing and Urban Development (HUD) officials and has written letters to HUD as attorney for GHURA, and likely would be able to influence decisions with respect to the Section 8 Housing Choice Voucher program. . . . As we stated in our letter of December 31, 2007 and, after reviewing your January 23, 2008 letter, we conclude that GHURA did not demonstrate "good cause" to support the waiver request.

(Mar. 2008 Flores Letter 1, ECF No. 124-49.) Further, Flores directed GHURA to terminate Lujan's remaining contracts:

> The information provided in your letter of January 23, 2008 indicates that eight HAP contracts are still in effect between GHURA and Mr. Lujan's wife and her real estate companies. For these eight cases, we will not recommend approval of the waiver of the conflict of interest provision and, therefore, GHURA will need to terminate all eight HAP contracts and reissue the voucher to the affected tenants. Please confirm that this action has been taken.

(*Id.* at 2.)

Finally, on April 18, 2008, De Guzman acknowledged receipt of Flores's directive to terminate all of the Lujan-related contracts, but again sought a limited waiver for the tenants to remain in the units until the termination of the contract terms based on hardship the tenants would endure in relocating. (April 2008 De Guzman Letter 1, ECF No. 124-51.) De Guzman confirmed that once the contracts expired, they would not be renewed. (*Id.*) Flores responded one month later, approving the waiver request for only five of the Lujan-related HAP contracts to allow families with school children to continue to live in their unit only until July 31, 2008. (May 2008 Flores Letter 1, ECF No. 124-52.) As for the remaining three contracts, two had already expired by the date of the letter on May 1st, and the third was to expire on June 1st.

### C. Smith's employment with GHURA and HAP contracts

#### 1. Smith becomes a Section 8 landlord in 2004 and GHURA legal counsel in April 2011.

From 2000 to 2002, Smith served as principal legal counsel to GHURA. (US' CSMF ¶ 11; *see* Smith's CSMF ¶ 1.) At the time, Smith was not a Section 8 landowner. (*Id.*) In 2004, Smith became a Section 8 landlord and began receiving HAP payments. (US' CSMF ¶ 13; *see* Smith's CSMF ¶ 1.) In March of 2011, GHURA issued a "Request for Proposal Legal Services" ("RFP"), soliciting proposals for legal services to replace Lujan's firm. (US' CSMF ¶ 14; Smith's Debarment Resp. 30–60, ECF No. 124-41.) The RFP contained multiple sections describing conflicts of interest (Smith's Debarment Resp. 44, 59–60) and required applicants to submit a letter "certifying that there is no conflict of interest with regards to services as required by GHURA" (*id.* at 34). On March 11, 2011, Smith submitted an application, stating that he would be "directly responsible for all matters involving GHURA" and would work "with each division manager." (*Id.* at 69–70.) Smith further noted his prior experience as GHURA legal counsel: "Although the GHURA contract was awarded to my previous law firm, Berman O'Connor & Mann, I was the principal attorney working on all GHURA matters." (*Id.* at 62.) As part of his application, Smith hand-delivered a letter to GHURA titled "Conflict of Interest," in which he stated, "[p]ursuant to the requisites for the RFP, I hereby certify that there is no conflict of interest with regard to me providing legal services to GHURA." (*Id.* at 128; US' CSMF ¶ 16.) Smith neither disclosed that he was a Section 8 landlord in his application nor notified any of those who interviewed him of this fact. (US' CSMF ¶ 16.)

On the same day, Smith submitted a signed draft "Attorney-Client Fee Agreement," which described the duties Smith would perform for GHURA, including: acting as counsel; preparing opinions, resolutions and reports "at the request of any member of the Board of Commissioners (BOC) or executive Director or its designee"; undertaking legal research as

"requested by the BOC of Executive Director or its designee"; advising the Board and Executive Director "of all legal matters to which [GHURA] is a party or in which [GHURA] is legally interested"; representing GHURA in litigation; reviewing and preparing contracts, leases, bid invitations, and other documents; providing "legal assistance and advice during any negotiations with [GHURA's] tenants and contractors"; and attending all BOC meetings. (Legal Services Contract 1–2, ECF No. 124-59.) GHURA's representative signed the fee agreement on March 18, 2011. (*Id.* at 4.) On April 28, 2011, GHURA's BOC approved Smith as GHURA counsel. (US' CSMF ¶ 20 (undisputed as to GHURA's approval of Smith's employment as GHURA counsel).) At around the same time that GHURA hired Smith, it also hired another law firm—Cabot Mantanona LLP—to serve as "conflicts counsel." (Smith's MSJ 7 (citing CSMF and Ex. B (citing Cr. Trial Trs., ECF Nos. 588–89; 593 *in* case no. 1:17-cr-00020)).)

**2. GHURA discovers its legal counsel, Smith, is a Section 8 landlord**

On July 14, 2011, GHURA's procurement manager saw Smith in the hallway at GHURA attending a HAP contract signing and recognized him as GHURA's new legal counsel. (US' CSMF ¶ 25; *see* Smith's Opp'n CSMF 2.) The procurement manager directly reported Smith's landlord status to GHURA executive management. (US' CSMF ¶ 26; *see* Smith's Opp'n CSMF 2.) The same day, GHURA's Section 8 Administrator sent an email to management titled "Conflict of Interest" stating:

> I need to let you know that our new attorney, Mark Smith is a landlord under the Section 8 program, which is a direct conflict of interest. Mr. Smith must disclosure his interest. Please be advise[d] that we would have to terminate any existing contracts with Mr. Smith unless his participation is approved by HUD.

(US' CSMF ¶ 27; San Nicolas & Camacho Emails July 2011 2, ECF No. 124-74.) Executive Director Marcel Camacho then instructed his staff to forward this email to Smith for his review and comment. (San Nicolas & Camacho Emails July 2011 1.) The Executive Director also talked

to Smith directly about the conflict and told him to review HUD's actions regarding David Lujan's request for a conflict waiver. (US' CSMF ¶ 28 (unaddressed by Smith); Cr. Trial Tr. Day 3 243–45, ECF No. 124-28.) In a separate proceeding, Smith submitted an affidavit to HUD stating in response to the Executive Director's comments, "I informed [him] that I determined to transfer my ownership interests in the properties . . . ." (US' CSMF ¶ 29 (unaddressed by Smith); Smith's Debarment Resp. 135.)

Smith was scheduled to sign a new HAP contract on August 2, 2011. (*See* US' CSMF ¶ 30 (unaddressed by Smith); GHURA Emails Aug. 2011, ECF No. 124-77.) Smith had not yet taken any action on the alleged conflict of interest, but GHURA staff were instructed to proceed with the contract signing. (US' CSMF ¶ 30 (unaddressed by Smith); GHURA Emails Aug. 2011.) One month later, Smith still had not taken any action as of September 9, 2011, when GHURA staff noted Smith was scheduled to sign another HAP contract and alerted management. (US' CSMF ¶ 31 (unaddressed by Smith); GHURA Emails Sept. 2011, ECF No. 124-79.)

**3. Smith signs HAP contracts and continues receiving payments into his personal account after applying to and becoming GHURA's legal counsel.**

After applying to become GHURA's legal counsel, Smith personally signed multiple new or updated HAP contracts containing the conflict-of-interest prohibition at Part B ¶ 13. (*See* US' CSMF ¶ 17 (unaddressed by Smith); ECF No. 124-17 at 2 (March 14, 2011); ECF No. 124-13 at 1 (April 11, 2011); ECF No. 124-4 at 1 (April 15, 2011); ECF No. 124-9 at 1 (May 12, 2011); ECF No. 124-18 at 14 (August 5, 2011).) Specifically, each contract provided that "the owner certifies and is responsible for assuring that no person or entity has or will have a prohibited interest" and agrees to "promptly and fully disclose [any] such interest to the PHA and HUD." (*See e.g.*, ECF No. 124-17 at 6 (Part B ¶ 13.d.–e. of HAP contract).) Smith's mother and power of attorney, Rosita Owen, executed one HAP contract on Smith's behalf on August 2, 2011, and specifically initialed the conflict-of-interest prohibition at Part B ¶ 13. (US' CSMF

¶ 17; ECF No. 124-2 at 1, 8.) Between April 2011 and June 2012, as an owner of thirteen (13) units in four different properties, Smith received fourteen (14) HAP payments from GHURA, totaling $98,239, that were deposited into his personal bank account. (US' CSMF ¶¶ 32, 34 (undisputed as to Smith's ownership of the units and receipt of HAP payments); ECF Nos. 124-2 to 124-20 (HAP Contracts).)

**4. Smith's work as GHURA's legal counsel.**

As GHURA's legal counsel, Smith, among other things, provided legal opinions to GHURA's BOC and executive management, reviewed and analyzed GHURA's Section 8 Administrative Plan, and billed GHURA for work regarding the Section 8 program. (US' CSMF ¶ 21 (unaddressed by Smith); Cr. Trial Tr. Day 12 150–51, ECF No. 124-36; Smith's Billing Records Oct. to Nov. 2011 1–2, ECF No. 124-63; Smith's Redacted Billing Records, ECF No. 124-64.) During the time period when he was directly receiving HAP payments into his personal account—between April 2011 and June 2012—Smith performed two tasks of particular relevance.

First, he prepared a brief legal memorandum, dated August 23, 2011, addressed to GHURA's Deputy Director with the subject line "RE: GHURA'S COMPLIANCE WITH HOUSING AND URBAN DEVELOPMENT ("HUD") REGULATIONS." (Smith's Legal Mem., ECF No. 124–65.) Smith drafted the memorandum to "stat[e] [his] position regarding GHURA's recent decision to pursue adverse actions against a number of employees for violating GHURA personnel rules and regulations." (*Id.* at 1.) The memorandum emphasizes GHURA's reliance on federal funding and highlights that "the failure of GHURA employees to strictly adhere to the requirements set out by HUD could adversely impact the federal funding and federal programs here on Guam." (*Id.*) With respect to the Section 8 program, the memorandum states:

> For example, the Section 8 low income program brings in over Twenty-Five Million Dollars ($25,000,000.00) of federal money into Guam every year. With each employee's failure to strictly adhere to the Section 8 program such as confirming the number of people living in said units, ensuring no criminal felons are housed in said units and other requirements set out, could lead to [sic] GHURA's non-compliance with HUD. This will result in loss of funding not only to GHURA as a Government agency but also to the Island of Guam through the federal programs cancellation.

(*Id.*) The memorandum concluded:

> [A]lthough pursuing adverse actions against employees is a position that most people would not envy, it is a position that GHURA must take in order to ensure compliance with HUD and to ensure the future funding of federal monies to GHURA and the federal programs [sic] survival here on Guam.

(*Id.* at 2.)

Second, Smith proposed revisions to GHURA's conflict-of-interest disclosure form, revisions which were ultimately accepted by the BOC. At a BOC meeting on January 31, 2012, GHURA's BOC Chairman asked Smith to review the conflict-of-interest disclosure form, which was used by GHURA to disclose all conflicts of interest, including those relevant to the Section 8 program. (US' CSMF ¶ 22; Smith's Opp'n CSMF 3; BOC Mins. Jan. 31, 2012 1, 5, ECF No. 124-66.) The Chairman also asked Smith to recommend revisions to the form that would clarify disclosure requirements. (BOC Mins. Jan. 31, 2012 5.) At a BOC meeting the following month, on February 21, 2012, Smith discussed his proposed changes, noting that the language was broad enough to cover both direct and indirect interests and that step- and half-sibling relationships would be covered. (BOC Mins. Feb. 21, 2012 3, ECF No. 124-67; BOC Meeting Tr. Feb. 21, 2012 2–5, ECF No. 124-71.) The Board then approved the new conflict of interest disclosure form, as revised by Smith. (BOC Mins. Feb. 21, 2012 3.) Two months later, on April 12, 2012, Smith himself signed a conflict of interest disclosure form wherein he indicated his disclosure is not required and that he had no conflict. (Smith's COI Discl. April 2012 3, ECF No. 124-110.)

### D. Smith's transfer of title to Glenn Wong and deposit of HAP payments into Wong's account

#### 1. Smith transfers title of his Section 8 rental properties to Glenn Wong in November 2011 but retains interests in the properties and Wong's bank account.

In November 2011, Smith transferred titular ownership of his Section 8 rental properties to Glenn Wong via quitclaim deed. (US' CSMF ¶ 35 (unaddressed by Smith); Quitclaim Deed 2011, ECF No. 124-87.) Unbeknownst to GHURA, Smith and Wong executed other property transfer agreements, including a purchase agreement (Purchase Agreement 2011, ECF No. 124-90), promissory note (Promissory Note 2011, ECF No. 124-89), and mortgage (Mortgage 2011, ECF No. 124-96), which gave Smith a security interest in the properties. (US' CSMF ¶ 35 (unaddressed by Smith).) Smith and Wong recorded only the quitclaim deed on December 12, 2011 (Recording Dec. 12, 2011, ECF No. 124-58) and submitted only that document to GHURA in January 2012 (Quitclaim Deed 2011 1). (US' CSMF ¶ 35 (unaddressed by Smith).) Under the terms of the purchase agreement and promissory note, Wong was obligated to pay Smith a $10,000 deposit (Purchase Agreement 2011 2) and make $10,000 monthly payments by check (Promissory Note 2011 1). As security or collateral, Wong executed a "reverse" quitclaim deed that transferred Wong's interests in the rental properties back to Smith. (Purchase Agreement 3.)

Section 8 staff later came to understand that Wong was the informally adopted child of Rosita Owen, Smith's mother. (US' CSMF ¶ 36 (unaddressed by Smith).) Wong had designated Owen as his "Mother" on a Depositor Agreement he submitted to a bank in 1997. (*Id.* (unaddressed by Smith); Wong's Depositor Agreement 2, ECF No. 124-94.) On November 14, 2011, Wong executed a Special Power of Attorney ("POA") giving Owen authority to operate and manage the rental properties on Wong's behalf. (US' CSMF ¶ 37 (unaddressed by Smith); Special POA, ECF No. 124-97.)

Wong, through his POA Owen, eventually executed amendments to the relevant HAP contracts to make himself the new landlord of the Section 8 rental properties. (US' CSMF ¶ 38 (unaddressed by Smith); ECF Nos. 124-2–124-20 (HAP Contracts).) Wong's physical address as a landlord in GHURA's system was the address for Smith's law office, and his email address in GHURA's system was the email address of Smith's legal secretary, who received landlord statements from GHURA for Wong. (US' CSMF ¶ 38 (unaddressed by Smith); GHURA Statement 15–16, ECF No. 124-99.)

On February 14, 2012, Smith's legal secretary sent GHURA direct deposit information for a First Hawaiian Bank ("FHB") account (ending in -1317) that Wong wanted to use for HAP fund deposits. (US' CSMF ¶ 39 (unaddressed by Smith); GHURA Emails re FHB Acct. -1317, ECF No. 124-96.) GHURA rejected that account after it obtained an account certification that revealed Smith was a joint account owner. (US' CSMF ¶ 39 (unaddressed by Smith); GHURA Emails re FHB Acct. -1317 1, 4.) About one month later, on March 8, 2012, Smith's legal secretary submitted a new FHB account (ending in -8369) for which Wong was the sole owner. (US' CSMF ¶ 40 (unaddressed by Smith); GHURA Emails re FHB Acct. -8369 2–3, 5, ECF No. 124-100.) Shortly thereafter, on March 26, 2012, Wong executed a debit authorization on that account for Smith, which Smith used to withdraw HAP funds on multiple occasions. (US' CSMF ¶ 40 (unaddressed by Smith); Debit Authorization, ECF No. 124-101; *see generally* FHB Receipts, ECF No. 124-102.) Wong did not revoke this debit authorization until April 13, 2013, a month before Smith resigned from GHURA. (US' CSMF ¶ 40 (unaddressed by Smith); Debit Authorization Revocation, ECF No. 124-105.) Neither Smith nor Wong disclosed the existence of this debit authorization at any time. (US' CSMF ¶ 40 (unaddressed by Smith).)

//

//

**2. GHURA holds payments to Wong beginning in February 2012.**

In February 2012, after GHURA staff noted that Smith was a joint account holder in the first FHB account (ending in -1317) submitted by Wong for HAP fund deposits, GHURA placed a hold on payments to Wong. (US' CSMF ¶ 41 (unaddressed by Smith); *see* GHURA Emails re Feb. & April 2012 Payments, ECF No. 124-106.) On March 27, 2012, GHURA Section 8 staff noted that Smith's mother signed a HAP contract amendment as Wong's power of attorney. (US' CSMF ¶ 41 (unaddressed by Smith); GHURA Emails re Feb. & April 2012 Payments.) Accordingly, his April 2012 payment remained on hold, despite the fact that Smith's legal secretary had submitted a new FHB account (ending in -8369) for which Wong was the sole owner listed. (GHURA Emails re Feb & April 2012 Payments.)[3]

**3. Smith maintains he has no conflict of interest but discloses his ownership interests at the April 12, 2012 BOC Meeting.**

On April 12, 2012, Smith signed a copy of the GHURA conflict-of-interest form which he had helped to draft, certifying that he was in compliance with GHURA and HUD's conflict-of-interest policy and stating he had "no direct or indirect interest." (US' CSMF ¶ 42 (unaddressed by Smith); Smith's COI Discl. April 2012.) That same day, at a GHURA BOC meeting, Smith disclosed that he owned "a few units that are being rented to GHURA" and had approximately 15 tenants. (US' CSMF ¶ 43 (unaddressed by Smith); BOC Meeting Tr. April 12, 2012 1, ECF No. 124-111; BOC Mins. April 12, 2012 15, ECF No. 124-112.) Smith argued he did not decide policy or make decisions with respect to his units and, accordingly, should not be considered to have a conflict. (US' CSMF ¶ 43 (unaddressed by Smith); BOC Meeting Tr. April 12, 2012 1; BOC Mins. April 12, 2012 14.) He noted that he had other apartments, such as the

---

[3] These withheld payments were later issued by GHURA, which appear to be identified as "Adjustments" in GHURA statements. (*See* US CSMF ¶ 48; HAP Payment Spreadsheet 6–11, ECF No. 124-124; GHURA Statement 6–7.)

Lauren Rose Apartments in the village of Agat, which he wanted to rent out to HCV tenants but did not want to have to "circumvent the whole ownership process or anything of that sort[,]" even though he said the restrictions were "easy to get around" and noted that if HUD "want[s] to be legal, we can be legal . . . ." (US' CSMF ¶ 43 (unaddressed by Smith); BOC Meeting Tr. April 12, 2012 1, 8.) GHURA's BOC Chairman pointed out that Smith "do[es] provide legal advice on issues arising from . . . Section 8 . . . ." (US' CSMF ¶ 43 (unaddressed by Smith); BOC Meeting Tr. April 12, 2012 7.) GHURA's BOC Vice Chairman brought up David Lujan's conflict matter, noting HUD's conclusion that Lujan had a conflict even though he had transferred his interests to his wife and a local attorney had submitted a contrary legal opinion to the agency. (US' CSMF ¶ 43 (unaddressed by Smith); BOC Meeting Tr. April 12, 2012 2–4.)

At the same meeting, GHURA's BOC Chairman noted Smith's name was on the deposit account submitted by Wong. (US' CSMF ¶ 44 (unaddressed by Smith); BOC Meeting Tr. April 12, 2012 11.) Smith responded, "[i]t's changed . . . . It's changed already[,]" but did not disclose that he had obtained a debit authorization on the new FHB account (ending in -8369) submitted by his legal secretary in place of the joint account. (US' CSMF ¶ 44 (unaddressed by Smith); BOC Meeting Tr. April 12, 2012 11.) Lastly, GHURA's BOC Chairman directed Smith to prepare a letter to HUD, for the Chairman's review and signature, describing Smith's interests. (US' CSMF ¶ 44 (unaddressed by Smith); BOC Meeting Tr. April 12, 2012 5–8.) The Chairman stated it would be "prudent" to "present the case very clearly to HUD." (BOC Meeting Tr. April 12, 2012 8.) At the next BOC meeting held April 30, 2012, Smith had not prepared the letter but stated he would work with the Executive Director to do so. (US' CSMF ¶ 46 (unaddressed by Smith); BOC Meeting Tr. April 30, 2012 12–13, ECF No. 124-113.) Smith never submitted a letter describing all his interests in HAP contracts.

**4. GHURA's Executive Director claims Smith is not a covered individual and orders the release of HAP payments in May 2012.**

On May 3, 2012, GHURA's Executive Director Ray Topasna issued an email, followed by a separate memorandum on May 29, 2012, to Section 8 staff, claiming the BOC's "position" was that Smith was not a covered individual because he did not formulate policy or influence decisions with respect to the Section 8 program. (US' CSMF ¶ 47 (unaddressed by Smith); Topasna Email May 3, 2012, ECF No. 124-114; Topasna Mem. May 29, 2012, ECF No. 124-115.) On May 24, 2012, the Executive Director directed Section 8 staff to release all suspended payments "relative to our legal counsel" pending the issuance of a legal opinion from GHURA's conflicts counsel on the issue. (US' CSMF ¶ 48 (unaddressed by Smith); GHURA ED Email May 24, 2012, ECF No. 124-108.)

**5. Smith transfers title of another Section 8 property to Wong in August 2012, but Smith manages the properties and maintains interests in the HAP payments.**

In August 2012, Smith executed another quitclaim deed to Wong transferring his interests in a separate property, the Lauren Rose Apartments in the village of Agat. (US' CSMF ¶ 49 (unaddressed by Smith); Recording & Quitclaim Deed 2012 2–4, ECF No. 124-118.) They recorded only the quitclaim deed on October 9, 2012. (Recording & Quitclaim Deed 2012 1–2.) Smith and Wong did not record or provide to either GHURA or HUD the purchase agreement (Purchase Agreement 2012, ECF No. 124-120), promissory note (Promissory Note 2012, ECF No. 124-121), or mortgage (Mortgage 2012, ECF No. 124-122) they executed as a part of this 2012 transaction. (US' CSMF ¶ 50 (unaddressed by Smith).) Wong agreed to pay a $10,000 deposit and, thereafter, to make $10,000 monthly payments by check. (*Id.* (unaddressed by Smith); Purchase Agreement 2012 1; Promissory Note 2012 1.) Wong again provided a "reverse" quitclaim deed as collateral for Smith, as he did for the 2011 transaction. (US' CSMF ¶ 50 (unaddressed by Smith); Purchase Agreement 1.) Smith and Wong leased units at this property

to Section 8 tenants and received HAP payments for them. (US' CSMF ¶ 53 (unaddressed by Smith); HAP Payments Spreadsheet 3, ECF No. 124-124.)

Smith and his legal secretaries managed Wong's rental properties but did not charge Wong for this work. (US' CSMF ¶ 62 (unaddressed by Smith).) Among other tasks, Smith's legal secretaries acted as Wong's power of attorney, collected tenant payments, and even conducted a property inspection. (*Id.* (unaddressed by Smith).) Smith fired one of his secretaries for failing to follow through with one of Wong's tenants. (*Id.* (unaddressed by Smith).) Smith's secretaries did not observe Wong performing any tasks in relation to the rental properties, and had only heard from Smith that Wong cleaned an air-conditioning unit on one occasion and cut the grass on another. (*Id.* (unaddressed by Smith).) Tenants did not interact with Wong as their landlord. (*Id.* (unaddressed by Smith).) The 2011 and 2012 purchase agreements provided that all utility accounts would be transferred from Smith to Wong within one year of the purchase dates, but none were. (*Id.* ¶ 63 (unaddressed by Smith); *see* Purchase Agreement 2011 5; Purchase Agreement 2012 4.) During the entire period of Smith's alleged conflict of interest, only two of the utility accounts were transferred into Wong's name—one unit only for a matter of weeks—but all payments were made either with a credit card attributed to Smith or, less frequently, with a credit card of unknown ownership. (US' CSMF ¶ 64 (unaddressed by Smith).) No payments were attributed to Wong. (*Id.*)

Between March of 2012 and May of 2014, GHURA deposited a total of $281,184 in twenty-six (26) HAP payments to Wong's FHB account (ending in -8369). (*Id.* ¶ 65 (unaddressed by Smith.) All of those funds ultimately were paid directly to Smith, to other accounts on Smith's behalf, or otherwise for Smith's benefit. (*Id.* (unaddressed by Smith).)

//

//

### 6. HUD discovers Smith's potential conflict in September 2012 but payments on Wong's HAP contracts continue.

On September 9, 2012, HUD learned that GHURA's legal counsel Smith might have a conflict of interest. (US' CSMF ¶ 66; Smith's Opp'n CSMF 3; Kaoholokula Email Sept. 19, 2012, ECF No. 124-173.) HUD believed David Lujan to be GHURA's legal counsel, but GHURA's Section 8 Administrator, Norma San Nicolas, responded informing HUD that Smith was actually current legal counsel, and that she believed a conflict existed. (Kaoholokula Email Sept. 19, 2012.) On September 20, 2012, HUD reminded GHURA that the GHURA BOC "is not empowered to waive the conflict of interest provisions," that any conflicts "must stop immediately[,]" and demanded that GHURA submit an accounting of relevant HAP contracts and payments within 14 days. (US' CSMF ¶ 66 (unaddressed by Smith); Flores Email Sept. 20, 2012, ECF No. 124-177.) GHURA suspended payments to Wong that same day, at the direction of Executive Director Topasna. (US' CSMF ¶ 66 (unaddressed by Smith); Topasna Email Oct. 3, 2012 42, ECF No. 124-72.) At the September 27, 2012 BOC meeting, Topasna notified the BOC of HUD's conflict-of-interest investigation but did not name any individual. (US' CSMF ¶ 67 (unaddressed by Smith); BOC Meeting Tr. Sept. 27, 2012 1, ECF No. 124-182.) Further, Millie Taitano noted that, despite the BOC Chairman's earlier directive to Smith in April 2012 to prepare a letter describing his interests in the rental properties transferred to Wong, Smith never prepared the letter. (US' CSMF ¶ 67 (unaddressed by Smith); *see* BOC Meeting Tr. Sept. 27, 2012 1–2.)

On October 3, 2012, Topasna provided records regarding Wong and Smith's potential conflicts to HUD, specifically addressing them to Flores. (Topasna Email Oct. 3, 2012 1.) The records included HAP payments made to Wong and Smith (*id.* at 3–27), a copy of the 2011 quitclaim deed (*id.* at 28–31), and BOC meeting minutes demonstrating the Board had been properly advised it was required to submit a waiver request for any potential conflict of interest

to HUD (*id.* at 32–36.) Topasna's response added that he has ensured waiver requests have been submitted for "any individual employed with GHURA who is subordinate to Executive Management[;]" "[u]nfortunately, GHURA's legal counsel does not report directly to Executive Management, and instead reports directly to the GHURA Board of Commissioners." (*Id.* at 2.)

At a BOC meeting on October 25, 2012, when discussing HUD's conflict-of-interest investigation and the necessity of hiring additional legal counsel to submit a legal opinion to HUD about compliance with local law, Smith stated he has no conflict and does not "own any property here in GHURA." (BOC Meeting Tr. Oct. 25, 2012 1–4, ECF No. 124-84; *see* US' CSMF ¶ 68 (unaddressed by Smith).) Smith did not disclose his relationship with Wong or his ongoing interests in the rental properties and HAP payments. (US' CSMF ¶ 68 (unaddressed by Smith).)

At a BOC meeting on November 8, 2012, the Board was informed it received notice from HUD about the conflicts of interest brought to HUD's attention. (BOC Nov. 8, 2012 Mins. 2, ECF No. 124-87.) GHURA's Executive Management identified six employees that may have conflicts per the regulations, in addition to the Governor and GHURA's conflicts counsel—Cabot Mantanona LLP. (*Id.*) Management sought BOC approval to proceed with the request for waivers from HUD for all these individuals. (*Id.*) Executive Director Topasna then informed the Board that Cabot Mantanona LLP resigned as GHURA's conflicts counsel the day before the BOC meeting. (*Id.* at 3.) During the discussion of the conflict of interest issue and the need for waivers to be submitted to HUD, Smith made a statement that HUD could still waive these conflicts. (*Id.* at 5.) For their next meeting, the BOC directed Management to report on how many contracts are affected by the waivers, and the amounts in dollar terms. (*Id.* at 6.) Towards the end of the BOC meeting, the BOC unanimously voted to terminate Topasna as GHURA's

Executive Director effective immediately if he did not tender his resignation by 5 p.m. that day. (*Id.* at 11.)

**7. GHURA's Executive Director Duenas orders release of payments in December 2012.**

On December 10, 2012, GHURA's new Executive Director, Mike Duenas, instructed staff to release HAP payments to two landlords, including Wong, based on the order of the BOC at its meeting on "November 9 [sic], 2012." (Duenas Emails Dec. 2012 1, ECF No. 124-191; *see* US' CSMF ¶ 70.) San Nicolas responded that she was not informed of this, and reminded Duenas of HUD's email "which clearly states that we have to 'Stop' [sic] any potential conflict of interest . . . ." (Duenas Emails Dec. 2012 2.) Duenas confirmed the HAP payments should be released immediately because such is the BOC's "directive." (*Id.*) Duenas further explained that GHURA is working to acquire the services of a conflicts attorney, who will ultimately submit a waiver request to HUD once hired. (*Id.*) Neither the November 8, 2012 meeting minutes nor transcript reflect that the BOC ordered the release of payments to Wong. (*See* BOC Mins. Nov. 8, 2012; BOC Meeting Tr. Nov. 8, 2012, ECF No. 124-87.)

On December 28, 2012, HUD's Honolulu Field Office emailed Executive Director Duenas, relaying the concerns of HUD's Regional Administrator that Wong's "contracts continue to receive money without this matter coming to a head." (US' CSMF ¶ 71 (unaddressed by Smith); Flores Email Dec. 28, 2012, ECF No. 124-189.) GHURA forwarded HUD's email to Rick Bordallo, a local attorney who had attended the November 8, 2012 BOC meeting on behalf of Smith (*see* BOC Nov. 8, 2012 Meeting Tr. 1), asking for a waiver request from Smith to be submitted to HUD no later than December 31, 2012. (Flores Email Dec. 28, 2012 1.) Bordallo responded that he would "confirm with Mark" about his "recommendations on how to proceed." (*Id.*) Smith himself never submitted a waiver request. (US' CSMF ¶ 73.)

**8. GHURA submits a waiver request on behalf of Smith to HUD in April 2013.**

On April 23, 2013, GHURA's Executive Director Duenas submitted a waiver request for Smith to HUD, dated April 15, 2013. (US' CSMF ¶ 74 (unaddressed by Smith); GHURA Waiver Req. May 2013 8–10, ECF No. 124-198.) Attached to the waiver request was a legal opinion that Smith was not a covered individual, drafted by GHURA's conflicts counsel Anthony Perez from the Law Office of Anthony Perez. (US' CSMF ¶ 74 (unaddressed by Smith); Perez Legal Op., ECF No. 124-131.) Mr. Perez opined:

> Attorney Smith has deeded ownership of his Section 8 units to Mr. Wong via quitclaim deed. . . . Through execution of the quitclaim deed, Attorney Smith has transferred all his interests in these properties to Mr. Wong, and thus has no ownership interest left. . . . Furthermore, there is no evidence that Attorney Smith receives any payments or benefits under Mr. Wong's HAP contracts. Mr. Wong has a personal bank account that directly receives Section 8 payments of which Attorney Smith is not an account holder.

(Perez Legal Op. 4–5.)

HUD's Honolulu Field Office forwarded the waiver request to HUD headquarters, recommending that the request be denied because "[n]either [Mr. Perez] nor Mr. Smith has provided satisfactory evidence that the conflict of interest has been resolved . . . ." (US' CSMF ¶ 74 (unaddressed by Smith); HUD Waiver Req. 2013 1, ECF No. 124-200.) The Field Office concluded Smith was a covered individual because "he is a subcontractor under a legal services contract with GHURA, and is involved in providing legal counsel and interpretation and advice to GHURA regarding program regulations, rules, processes, and policy." (US' CSMF ¶ 74 (unaddressed by Smith); HUD Waiver Req. 2013 4.) The Field Office noted Wong's use of Smith's mother as power of attorney and Smith's "access to Wong's bank account where Section 8 monies are deposited." (US' CSMF ¶ 74 (unaddressed by Smith); HUD Waiver Req. 2013 4.) With respect to its reason for recommending denial of a waiver, the Field Office stated:

> Although under 24 CFR 982.161(c), HUD may waive such conflicts for good cause, legal cautions such a waiver in this particular case because of the unique

> island customs/practices of Guam (and other island jurisdictions). Unlike larger states/cities, in an island community like Guam, "word of mouth" is not just a figure of speech but a way of life. If a conflict of waiver [sic] is granted in this instance, the message that will be circulated around Guam is that this type of conflict has been accepted by HUD, and therefore, others who may have similar conflicts will be encouraged to continue this type of practice. As such, even if HUD approves this conflict of interest in this instance, legal recommends some type of sanction to make clear that such conflicts of interest are not encouraged nor acceptable to HUD.

(HUD Waiver Req. 2013 4; *see* Smith's Opp'n CSMF 4.)

**E. Smith's resignation and post-resignation events**

In late May 2013, an advisor to the Governor of Guam met with Smith and GHURA's BOC Chairman to address Smith's conflict of interest; Smith agreed to let the Chairman look at the property transfer documents in Smith's office. (US' CSMF ¶ 75 (unaddressed by Smith).) Smith resigned as legal counsel within twenty-four (24) hours of the Chairman's review of those documents. (*Id.* ¶ 76 (unaddressed by Smith); Duenas Email re Smith Resignation, ECF No. 124-201.) On May 23, 2013, GHURA's BOC accepted Smith's resignation, effective as of May 21, 2013. (BOC Mins. May 23, 2013 1, 3, ECF No. 124-202; *see* US' CSMF ¶ 76 (unaddressed by Smith).) During Smith's tenure as GHURA's legal counsel, he submitted seven invoices for legal services to GHURA, for a total of $197,777. (US' CSMF ¶ 77 (unaddressed by Smith); *see* Smith's Legal Invoices Redact., ECF No. 124-64.) GHURA notified HUD of Smith's resignation on May 22, 2013. (US' CSMF ¶ 78 (unaddressed by Smith); Duenas Email re Smith Resignation 1.) HUD still wanted the waiver request because of the one-year "tail" in the conflict-of-interest provisions, and GHURA resubmitted the request in June 2013. (US' CSMF ¶ 78 (unaddressed by Smith); GHURA Waiver Req. June 2013, ECF No. 124-205.) At the request of HUD's Honolulu Field Office, HUD's Departmental Enforcement Center ("DEC") conducted a review of Smith's conflict-of-interest case. (US' CSMF ¶ 79 (unaddressed by Smith); Wu Email Oct. 2013, ECF No. 124-207; DEC Report 3, ECF No. 124-203.) On February 20, 2015, DEC issued

its findings, recommending Smith's debarment, and concluding that Smith was a covered individual and that the payments he received violated 24 C.F.R. § 982.161 and Part B ¶ 13 of the HAP contracts. (US' CSMF ¶ 79 (unaddressed by Smith); DEC Report 3.)

Before the DEC issued its findings, in 2014, when Smith needed funding for a separate development, Wong sold the Smith Apartments and paid the $687,098.72 in sales proceeds to Smith. (US' CSMF ¶ 60 (unaddressed by Smith).) At roughly the same time and for the same purpose, Wong also took out a mortgage with the Bank of Guam for $350,000 on three of the properties and sent the mortgage proceeds to Smith. (*Id.* ¶ 61 (unaddressed by Smith).)

In 2015, Smith and Wong retroactively changed the purchase price and terms of the 2011 and 2012 property transactions. (*Id.* ¶ 57 (unaddressed by Smith).) Smith received assistance from Certified Public Accountants Michael Tomita and Patrick Heinz, who assisted in this retroactive process and with a Guam Department of Revenue and Taxation audit for tax years 2008 to 2013. (*Id.* ¶¶ 56–57 (unaddressed by Smith).) Their work resulted in new promissory notes and mortgages for both the 2011 and 2012 transactions. (*Id.* ¶ 58 (unaddressed by Smith).) Five and a half years later, Smith recorded the replacement mortgage for the 2012 transaction on June 4, 2021, shortly after Wong passed away. (*Id.* ¶ 59 (unaddressed by Smith).)

## III. PROCEDURAL BACKGROUND

The United States pursued civil, criminal, and administrative proceedings based on Smith's conduct. On November 6, 2015, Relator Ray Sanchez Topasna—former Executive Director of GHURA—initiated the instant qui tam civil action under the False Claims Act against Mark S. Smith, GHURA, and its "Board of Directors [sic]." (Topasna Compl., ECF No. 1.) After thirteen extensions for the United States' deadline to intervene in the matter were granted, the United States filed its complaint in intervention on September 11, 2019, almost four years after Topasna filed the lawsuit. (US Compl.) During this period, on March 14, 2017, the United States

filed federal criminal charges against Smith and co-defendant Wong. (ECF No. 1 *in* case no. 1:17-cr-00020.) Additionally, between 2017 to 2018, HUD filed two administrative complaints against Smith before U.S. HUD Office of Hearings and Appeals. (Smith's CSMF ¶ 7.) The administrative proceedings were stayed for several years while the criminal case proceeded. (Secretarial Order 7, ECF No. 14-2 *in* case no. 1:25-cv-00016.) On December 21, 2022, this Court acquitted Smith of his jury convictions on all counts. (ECF No. 686 *in* case no. 1:17-cr-00020.)

In the administrative proceedings, on November 15, 2024, Administrative Law Judge J. Jeremiah Mahoney entered a consolidated order as to both HUD's 2017 and 2018 complaints, finding Mr. Smith submitted twenty-five (25) false and fraudulent claims and imposing assessments totaling $532,872, and civil penalties totaling $202,500 for a total penalty of $735,372 pursuant to the Program Fraud Civil Remedies Act ("PFCRA"). (ALJ Order, ECF No. 14-3 *in* case no. 1:25-cv-00016.) On or about February 11, 2025, Secretarial Designee Andrew Hughes issued a final Order on Secretarial Review affirming that finding. (Secretarial Order.) Judicial review of the agency's determinations is the subject of another suit before this Court. (Pet., ECF No. 1 *in* case no. 1:25-cv-00016.)

## IV. SUMMARY JUDGMENT LEGAL STANDARD

A court must grant summary judgment on a claim or defense—or part of each claim or defense—if there is no genuine issue of material fact for trial and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movants must support their position that a material fact is or is not genuinely disputed by either "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing that the materials cited do not establish

the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

A party moving for summary judgment who bears the burden of proof at trial must produce evidence that would entitle him to a directed verdict if the evidence went uncontroverted at trial. *C.A.R. Transp. Brokerage Co., Inc. v. Darden*, 213 F.3d 474, 480 (9th Cir. 2000). Once the moving party meets its initial burden, the non-moving party must go beyond the pleadings and by its own evidence "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 480. To make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)). If the non-moving party fails to make this showing, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

A party moving for summary judgment who does not have the ultimate burden of persuasion at trial must produce evidence which either negates an essential element of the non-moving party's claims or show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits." *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citations omitted). "If a genuine dispute of material fact exists, a court must deny both motions." *Fed. Trade Comm'n v. Am. eVoice, Ltd.*, 242 F. Supp. 3d 1119, 1121 (D. Mont. 2017) (citation omitted). However, if there is no dispute of material fact and only one party is entitled to judgment as a matter of law, a court may grant summary judgment as to that party only. *E.g.*, *Johnson v. Diaz*,

339 F. Supp. 60, 65 (C.D. Cal. 1971) (granting one party's motion for summary judgment and denying other party's motion).

## V. DISCUSSION

The False Claims Act ("FCA"), codified at 31 U.S.C. §§ 3729 *et seq.*, provides the federal government with a civil remedy for false claims. The statute imposes civil liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment[,]" 31 U.S.C. § 3729(a)(1)(A), who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[,]" *id.* § 3729(a)(1)(B), or who conspires to do so, *id.* § 3729(a)(1)(C). The United States argues Smith is liable under both 31 U.S.C. § 3729(a)(1)(A) (false claims) and § 3729(a)(1)(B) (false record or statement material to false or fraudulent claim) for 47 false claims—40 false claims for HAP payments and seven for legal fees. (US' MSJ 27–28, 38.) In addition, the United States argues Smith is liable for two conspiracy violations under § 3729(a)(1)(C) based on his property transfers in 2011 and 2012.

As the Ninth Circuit has explained, "[i]n an archetypal *qui tam* False Claims action, such as where a private company overcharges under a government contract, the claim for payment is itself literally false or fraudulent." *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1170 (9th Cir. 2006) (citing *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996)). However, because Congress has "emphasized that the scope of false or fraudulent claims should be broadly construed[,]" the Ninth Circuit also recognizes the "false certification doctrine," which "attach[es] potential False Claims Act liability to claims for payment that are not explicitly and/or independently false . . . ." *Id.* at 1170–71. Under the false certification doctrine, "a claim under the False Claims Act can be false where a party merely falsely certifies compliance with a statute or regulation as a condition to government payment." *Id.* at 1171 (internal citations omitted). Under the false certification doctrine, the essential

elements of False Claims Act liability remain the same: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *Id.* at 1174; *see United States ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1017 (9th Cir. 2018). "The statute allows a civil penalty up to $10,000 for each violation and an award of '3 times the amount of damages which the Government sustains because of the' false claim." *Hendrix ex rel. United States v. J-M Mfg. Co., Inc.*, 76 F.4th 1164, 1169 (9th Cir. 2023) (quoting 31 U.S.C. § 3729(a)(1)).

For the following reasons, the Court GRANTS summary judgment in favor of the United States on all elements of liability with respect to payments on the HAP contracts starting from July 2011 onward when the United States established that Smith gained sufficient knowledge of his conflict as defined by the regulation.

**A. As a threshold matter, the United States may seek recovery under the False Claims Act regardless of the status of proceedings under the PFCRA.**

Smith argues the United States' complaint is barred because it elected to pursue penalties and assessments in administrative proceedings as an alternative remedy in 2017 and 2018, prior to the filing of the complaint. (Smith MSJ 7, 8.) In response, the United States has agreed to "offset any amount paid under the PFCRA judgment" against the damages amount entered in this FCA case. (US' Opp'n 16–17 n.16.) Despite the United States' representation, Smith argues that "as a legal matter, the statutory scheme should be construed to avoid double-dipping and double-litigation." (Smith's Reply 5–6.) Smith relies on *Thorncreek Apartments III, LLC v. Mick*, 886 F.3d 626, 637 (7th Cir. 2018), a Seventh Circuit case that does not discuss either the FCA or PFCRA.

Because the United States will offset the FCA and PFCRA judgments against one another (US' Opp'n 6–7 n.7), the legal question of whether the Government can collect damages under both the FCA and PFCRA for the same false claims is not ripe for adjudication. *See Thomas v.*

*Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (court's role is "neither to issue advisory opinions nor to declare rights in hypothetical cases"). Even if the Court were to decide the issue on the merits, the Court agrees with the United States: administrative remedies under the PFCRA are in addition to, not exclusive of, remedies under the FCA. Under the plain language of the PFCRA, PFCRA liability is imposed "in addition to any other remedy that may be prescribed by law . . . ." 31 U.S.C. § 3802(a)(1); *Roberts v. Shinseki*, 647 F.3d 1334, 1341 (Fed. Cir. 2011) ("Most significantly, the PFCRA is not an exclusive remedy.") Thus, the Court will proceed to analyze whether the following violations of the FCA occurred: 40 false claims for HAP payments, seven false claims for legal fees, and two instances of conspiracy based on Smith's property transfers in 2011 and 2012.

**B. The United States has sufficiently demonstrated that Smith made false statements with respect to 35 of the 40 HAP payments, but not with respect to the seven legal invoices.**

On falsity, the United States's argument is that Smith's claims for HAP payments and legal fees were false because as GHURA's legal counsel, Smith was a covered individual and thus prohibited from having an interest in any HAP contract, benefits, or payments. (*See generally* US' MSJ 33–37.) Smith argues he was not a covered individual when interpreting the term using traditional tools of construction. (*See generally* Smith's Opp'n 10–14; Smith's MSJ 9-14.) Based on the plain language of the HUD regulations governing GHURA's contractors, Smith as general legal counsel for GHURA was a covered individual and therefore had a conflict of interest because of his concurrent interest in the HAP contracts. He had a duty as GHURA's legal counsel, who had an interest in HAP payments from his HAP contracts as well as Wong's HAP contracts, to disclose his interest to GHURA and HUD, and only HUD's field office may waive the conflict of interest prohibition. *See* 24 C.F.R. § 982.161(b)–(c). Because Smith never obtained a waiver, he will be held liable for this conflict of interest violation.

### 1. Legal Standard

The falsity requirement can be satisfied by "express false certification, which 'means that the entity seeking payment falsely certifies compliance with a law, rule or regulation as part of the process through which the claim for payment is submitted.'" *Rose v. Stephens Inst.*, 909 F.3d at 1017 (internal brackets omitted) (quoting *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010)). As a Section 8 landlord, Smith was required to sign and adhere to the terms of HAP contracts for each property. The HAP contract's conflict of interest provisions, consistent with 24 C.F.R. § 982.161, prohibits a covered individual from having any interest in any HAP contract, benefits or payments. (*See, e.g.*, Ogo Lease and HAP Contract 8 ¶ 13.b.)

> a. "Covered individual" means a person or entity who is a member of any of the following classes:
>
> (1) Any present or former member or office of the PHA (except a PHA commissioner who is a participant in the program);
>
> (2) Any employee of the PHA, or any contractor, sub-contractor or agent of the PHA, who formulates policy or who influences decisions with respect to the programs;
>
> (3) Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the program; or
>
> (4) Any member of the Congress of the United States.

(*Id.* ¶ 13.a.) *See also* 24 C.F.R. § 982.161. By executing the contract, "the owner certifies and is responsible for assuring that no person or entity has or will have a prohibited interest, at execution of the HAP contract, or at any time during the HAP contract term." (*See, e.g.*, Ogo Lease and HAP Contract 8 ¶ 13.d.)

### 2. Covered individuals include individuals in a position to influence decisions with respect to the Section 8 program.

The United States argues Smith was a covered individual because he "was in a position to influence, and in fact influenced, Section 8 program decisions at GHURA for purposes of § 982.161 and Part B, ¶13 of the HAP contracts." (US' MSJ 28.) "Smith was legal counsel to GHURA's Board, and the RFP and his legal service contract both clearly state he was to provide

legal advice on *all* of GHURA's programs. (*Id.*) On the other hand, Smith argues that, from examining 24 C.F.R. § 982.161(a)(2) in its larger regulatory context and under the canon of *noscitur a sociis*, it is clear that "a 'decision' under the regulation must be on a disputed matter of major importance, similar to the importance of a policy determination." (Smith's MSJ 10.) "The 'decision' language does not include any ministerial or minor matter that may bear some relation to the program." (*Id.*) Further, Smith argues the relevant provision only includes individuals who "*actually* influence important decisions," not individuals who are "merely in a position or *capable* of influencing decisions . . . ." (*Id.* at 12 (emphasis in original).) Smith then applies his interpretation and argues that the two instances offered by the United States as examples of Smith actually influencing decisions are insufficient to deem him a covered individual. (*Id.* at 11–12.)

The Court finds that a plain reading of the regulation supports that individuals in a position to influence decisions with respect to the Section 8 program fall within its scope. The regulation defines distinct "classes of persons" who may not have any direct or indirect interest in a HAP contract. *See* 24 C.F.R. § 982.161. Sub-provisions (a)(1), (a)(3), and (a)(4) outline specific positions that are barred from holding an interest: (1) any present or former member or officer of the PHA (except a participant commissioner); (3) any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the programs; or (4) any member of the U.S. Congress. In light of these neighboring sub-provisions, it is most natural to also read sub-provision (a)(2) to refer to specific positions—in relevant part, contractors, subcontractors, or agents of the PHA who influence decisions with respect to the programs. The Court agrees with the United States that "Smith's reading produces an absurd result." (*See* US' Opp'n 10.) "If an agent or contractor did not become a 'covered individual' *until* they formulated a specific policy or influenced a specific decision, the

individual would essentially get a free pass to further their personal Section 8 interests *at least once* before the conflict-of-interest prohibition would apply to them." (*Id.* (emphasis in original).)

The duties outlined in Smith and GHURA's attorney-client fee agreement included preparing "opinions, resolutions and reports at the request of any members of the Board of Commissioners (BOC) or executive [sic] Director or its designee;" advising "the Board and the Executive Director of all legal matters to which the Authority is a party or in which the Authority is legally interested;" providing "legal assistance and advice during any negotiations with the Authority's tenants and contractors;" and attending "all Board of Commissioners meetings." (Legal Services Contract 1–2.) As GHURA's legal counsel, Smith certainly was in a position to influence decisions with respect to the Section 8 program.

**3. Even under Smith's own definition, he was a covered individual because he influenced decisions on at least two occasions.**

The United States names a number of instances where Smith, in fact, influenced decisions. First, Smith prepared a brief legal memorandum, dated August 23, 2011, and addressed to GHURA's Deputy Director, regarding GHURA's decision to pursue adverse actions against employees for violating the agency's personnel rules and regulations. (US' MSJ 32; Smith's Legal Mem.; *see supra* § II.B.4.) Second, Smith proposed revisions to GHURA's conflict-of-interest disclosure form, revisions which were ultimately accepted by the BOC on February 21, 2012. (US' MSJ 32; BOC Mins. Feb. 21, 2012 3; *see supra* § II.B.4.) Lastly, Smith made legal arguments in emails and at BOC meetings that he was not a covered individual, including a BOC meeting on April 12, 2012. (US' MSJ 30, 32; BOC Meeting Tr. April 12, 2012 1; *see supra* § II.D.3.)

The Court finds that at least these instances demonstrate Smith was a covered individual. First, the legal memorandum was an example of Smith influencing GHURA's decision to pursue

adverse actions against employees by affirming GHURA's decision, highlighting the consequences to GHURA and even the Section 8 program specifically of failing to strictly adhere to the relevant rules and regulations. (*See* Smith's Legal Mem. 1–2.) Smith advised that pursuing adverse actions against employees "is a position that GHURA *must take*" under these circumstances. (*See id.* at 2 (emphasis added).) Smith argues now that because GHURA had already made the decision to pursue adverse actions, "there was no decision to influence, and any purported decision was not with respect to the Section 8 program." (Smith's MSJ 12.) The Court disagrees and finds that Smith's legal memorandum, in providing the legal justification to support GHURA's decision, influenced GHURA within the meaning of the regulation.

Smith's revision of the conflict-of-interest disclosure form further supports that Smith was a covered individual. At the direction of GHURA's BOC Chairman, Smith reviewed and proposed revisions to GHURA's conflict-of-interest disclosure form—used for all programs including the Section 8 program—to incorporate disclosure requirements under federal and local law. (BOC Mins. Jan. 31, 2012 1, 5; BOC Meeting Tr. Feb. 21, 2012 1.) Smith discussed his proposed changes at a subsequent BOC meeting, noting that the language was broad enough to cover both direct and indirect interests and that step- and half-sibling relationships would be covered. (BOC Mins. Feb. 21, 2012 3; BOC Meeting Tr. Feb. 21, 2012 2–5.) By reviewing and proposing revisions to the conflict-of-interest disclosure form, Smith influenced the Board to adopt the form based on his legal opinion that it sufficiently requests conflict disclosures required by federal and local law. This decision to approve the form was directly related to the Section 8 program, as the form requires disclosure of conflicts related to all GHURA programs. (*See* Smith's COI Discl. April 12, 2012 3.)

Lastly, Smith's arguments directly to the Board at the April 12, 2012 BOC meeting during his attendance as GHURA's legal counsel that he is not a covered individual knowing he was still a Section 8 landlord is the exact situation the conflicts prohibition is intended to prevent.

Thus, the Court GRANTS summary judgment in favor of the United States on the issue of falsity with respect to the HAP contracts. Smith was a covered individual because he was in a position to influence decisions regarding the Section 8 program. Further, Smith actually influenced decisions on at least two occasions.

**4. The Court denies the United States' motion for summary judgment with respect to Smith's legal services invoices.**

Smith argues that the basis for falsity regarding his legal fees is unclear. (Smith's MSJ 13.) Specifically, Smith argues that his statement in his legal counsel application that he did not have a conflict of interest was made pursuant to the rules of professional conduct, and "[t]he government has never attempted to show that Mr. Smith was false or fraudulent." (*Id.*) "[E]ven if Mr. Smith was a covered individual under § 982.161, that does not mean his statement that he did not have a conflict of interest was false or fraudulent." (*Id.*) The United States responds that Smith "misunderstands the United States' theory of falsity[;]" the United States "has not relied on other rules of professional conduct to establish falsity" because "Smith had a conflict pursuant to Part B, ¶13 of the HAP contracts and to 24 C.F.R. § 982. 161." (*See* US' Opp'n 11–12.) Furthermore, in the United States' reply in support of its own motion for summary judgment, the United States contends that the certification in Smith's legal counsel application "is not specific to representational conflicts, but even if that were true, it does not defeat summary judgment" because "Smith did not, in that certification or elsewhere, disclose his Section 8 conflict of interest." (*See* US' Reply 7–8 n.7.) "Certifying that he had no conflict of interest while knowing he was a Section 8 landlord was, at the very least, an actionable misleading 'half-truth.'" (*Id.*)

The HAP contracts cannot serve as the basis for finding that Smith's claims for legal fees were false due to his conflict of interest. "[T]o commit conduct actionable under the FCA, one must, in some way, falsely assert entitlement to obtain or retain government money or property." *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1056 (9th Cir. 2011) (internal footnote omitted). Smith could not have falsely asserted his entitlement to *legal fees* by signing *HAP contracts*. The HAP contracts outline Section 8 landlords' entitlement to HAP payments, not legal counsel's entitlement to payment for legal services. Accordingly, it is improper for the United States to use any false statements made pursuant to the HAP contracts to recover the government funds paid as legal fees to Smith.

The conflict-of-interest letter submitted by Smith as part of his application to become GHURA's legal counsel can serve as the basis for falsity only if the letter falsely certified compliance with 24 C.F.R. § 982.161 and the HAP contracts. Here, Smith's conflict-of-interest letter, submitted on March 11, 2011, stated "[p]ursuant to the requisites for the RFP, I hereby certify that there is no conflict of interest with regard to me providing legal services to GHURA." (Smith's Debarment Resp. 128.) The RFP contained multiple sections describing conflicts of interest. (*Id.* at 44, 59–60.) However, the Court notes neither party identified any part of the RFP actually defining "conflict of interest" as that contained in the regulation. Even though the Court agrees with the United States that the certification in Smith's legal counsel application is not necessarily limited to representational conflicts, the Court finds that the United States has failed to demonstrate that the certification includes conflicts of interest as defined by the rules and regulations of the Section 8 Program, particularly at 24 C.F.R. § 982.161. Further, the Court concludes that 24 C.F.R. § 982.161 cannot serve as the standard for falsity with respect to Smith's claims for legal fees. The regulation cannot be read to prohibit a subcontractor who influences decisions—in this instance, Smith as legal counsel—from entering into a legal

services contract with GHURA. This appears to be GHURA and HUD's interpretation as well given the fact that Smith was able to serve as GHURA's legal counsel from 2000 to 2002 when he was not a Section 8 landlord. Moreover, because the regulation does not include landlords as a class of covered individuals barred from having an interest in, in this instance, a legal services contract with GHURA, there can be no conflict of interest by Smith as a landlord in the legal services contract. While the regulation prescribes GHURA from entering into a HAP contract with a landlord if someone from the enumerated class of persons or covered individuals has any interest, the inverse is not so in the context of a legal services agreement. In other words, the regulation does not prohibit GHURA from entering into a legal services agreement with an attorney because the other person, in this case a landlord, does not fall within the prohibited class at 24 C.F.R. § 982.161(a) and is not a member of the class that would have a duty to disclose at § 982.161(b). The landlord's duty arises from a HAP contract, not a legal services agreement.

Accordingly, the Court DENIES the United States' motion for summary judgment with respect to Smith's legal fee payments. Further, because the United States has not shown that the record would support summary judgment as to falsity, the Court need not evaluate the issues of scienter and materiality as to the legal fees.

**C. Smith knew that he was a covered individual and thus his claims for HAP payments were false.**

The United States argues that Smith possessed the requisite scienter of falsity because he was "aware that there was a 'substantial' and 'unjustifiable' risk that he was a 'covered individual'" from the beginning of his tenure as legal counsel. (US' MSJ 28–29.) The United States further argues "Smith had *actual* knowledge of his covered status no later than July 14, 2011, when GHURA expressly told Smith that GHURA *and HUD* had concluded David Lujan was a covered individual." (*Id.* at 29 (emphasis in original).) Smith argues that the United States' motion should be denied because there is a genuine dispute of material fact as to whether Smith

had the requisite knowledge that he was a covered individual because both GHURA's Executive Director and BOC took the position that Smith was not a covered individual given the hiring of conflicts counsel. (Smith's Opp'n 17.) In reply, the United States argues Smith was "nevertheless aware of a substantial and unjustifiable risk" that his, the Executive Director's, and the BOC's interpretation of the term covered individual was wrong. (US' Reply 9.)

**1. Legal Standard**

"To satisfy the scienter requirement, relators must allege 'a false statement or course of conduct made knowingly and intentionally.'" *United States ex rel. Hartpence v. Kinetic Concepts*, Inc., 44 F.4th 838, 851 (9th Cir. 2022). Under the FCA, "a false statement or false claim is knowingly made by a person if that person has actual knowledge of the falsity or if that person acts in deliberate ignorance or reckless disregard of its truth or falsity." *See* 31 U.S.C. § 3729(b)(1)(A). "The FCA's scienter element refers to respondents' knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed." *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749 (2023). "[T]he term 'deliberate ignorance' encompasses defendants who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statement's truth or falsity." *Id.* (internal citations omitted). "Congress amended the FCA to include acting in 'deliberate ignorance of the truth of falsity' specifically to address 'the problem of the "ostrich-like" refusal to learn of information which an individual, in the exercise of prudent judgment, had reason to know." *United States v. Chen*, No. 204-CV-00859-PMP-PAL, 2006 WL 2190762, at *1 (D. Nev. Aug. 1, 2006) (internal quotation marks omitted) (quoting *UMC Elecs. Co. v. United States*, 43 Fed. Cl. 776, 793 (1999) (quoting S. REP. No. 99-345 at 21 (1986))). "[T]he term 'reckless disregard' similarly captures defendants who are conscious of a substantial and unjustifiable risk that their

claims are false, but submit the claims anyway." *Schutte*, 598 U.S. at 751 (internal citations omitted).

Nonetheless, "although a defendant's reasonable interpretation of a regulation does not preclude a finding of falsity under the FCA, a defendant who relies on 'a good faith interpretation of a regulation is not subject to liability.'" *United States v. Chen*, 402 Fed. App'x 185, 188 (9th Cir. 2010) (quoting *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 464 (9th Cir. 1999)); *see Schutte*, 598 U.S. 757 ("For scienter, it is enough if respondents believed that their claims were not accurate.") "This is true 'not because his or her interpretation was correct or reasonable but because the good faith nature of his or her action forecloses the possibility that the scienter requirement is met.'" *Id.* (quoting *Oliver*, 195 F.3d at 464) (internal quotation marks omitted). "[T]he extent and the nature of *government* knowledge may show that the defendant did not 'knowingly' submit a false claim . . . ." *United States ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321, 327 (9th Cir. 1995) (emphasis added).

**2. Smith had the requisite knowledge beginning in July 2011, when Executive Director Camacho referred him to the Lujan matter.**

The record before the Court demonstrates that in July 2011, when GHURA discovered Smith was a Section 8 landlord and Executive Director Camacho told him to review HUD's actions regarding Lujan's request for a conflict waiver, Smith began acting in deliberate ignorance of whether he was a covered individual. On July 14, 2011, after GHURA's procurement manager learned that Smith was a Section 8 landlord by observing his attendance at a HAP contract signing, Millie Taitano alerted Smith about the matter at the direction of Director Camacho. (*See* San Nicolas & Camacho Emails July 2011 1–2.) Based on this discovery, Director Camacho spoke with Smith directly about the conflict and told him to review HUD's actions regarding Lujan's request for a conflict waiver. (US' CSMF ¶ 28; Cr. Trial Tr. Day 3 243–45.) In the Lujan matter, HUD wrote that Lujan was likely a covered individual even

though Lujan himself was not primary counsel on GHURA matters—Anthony Perez, his partner, was. (*See* Dec. 2007 Flores Letter; Mar. 2008 Flores Letter; 2003 De Guzman Letter 1; Taitano 2013 Emails to Bordallo 3.) Further, by Smith's own admission in a separate proceeding, he attested that shortly after July 14, 2011, he met with Director Camacho, who advised that he must seek a waiver of the potential conflict, unless he determined he would transfer his ownership interests in the rental properties. (Smith's Debarment Resp. 135.) Smith informed Director Camacho that he would transfer his ownership interests. (*Id.*)

Despite the notice Director Camacho provided about the prior Lujan matter and his status as a covered individual—which required Smith to either seek a waiver or transfer his ownership interests—Smith continued receiving payments on HAP contracts and never reached out to HUD about its interpretation of whether he was a covered individual, and if so, to seek a waiver. Based on these facts, Smith acted with deliberate ignorance, as he was aware of a "substantial risk" that he was a covered individual and thus his subsequent certifications of compliance with the terms of the HAP contracts were false. *See Schutte*, 598 U.S. at 751. He "intentionally avoid[ed] taking steps to confirm the statement[s'] truth or falsity." *See id.* Even though GHURA did not have conflicts counsel when Lujan's firm was employed, Smith failed to take any steps to confirm with conflicts counsel during his own employment about whether he was a covered individual. In particular, Smith's arguments about conflicts counsel fails because the conflicts counsel was hired at the *same time* that Smith was, when no one at GHURA knew Smith was a Section 8 landlord. (*See* Smith's MSJ 7.) Therefore, the record demonstrates that the conflicts counsel was not hired to address Smith's own conflict with Section 8 matters, and is compounded by Smith failing to confer and confirm with the conflicts counsel about whether he was a covered individual at any time. Rather, in April 2012, he certified in writing that he did not have a conflict of interest, as well as personally argued to the BOC at a BOC meeting that he did not have a

conflict. (Smith's COI Discl. April 2012.) Such actions—or lack thereof—demonstrates Smith's deliberate ignorance and said certification forms the basis of Count III's false claim for making a false record in violation of § 3729(a)(1)(B).

**3. Smith still had the requisite knowledge after transferring his Section 8 properties to Wong.**

After Smith transferred his titular ownership in the Section 8 properties to Wong in November 2011 and August 2012, GHURA continued to raise concerns about Smith's interests in the HAP contracts, leading it to suspend payments on multiple occasions. In response, Smith would assure the BOC that no conflict existed, without fully disclosing the full extent of his ownership interests. In February 2012, GHURA held payments to Wong after it discovered Smith was a joint account holder in the listed FHB account for HAP deposits. (GHURA Emails re Feb. & April 2012 Payments.) Smith's April 2012 payment remained on hold because GHURA Section 8 staff noted Smith's mother signed a HAP contract amendment as Wong's power of attorney in March. (*Id.*) At the April 12, 2012 BOC Meeting, Smith disclosed that he owned "a few units that [were] being rented to GHURA." (BOC Meeting Tr. April 12, 2012 1.) When questioned by the BOC Chairman about the fact that his name was on the bank account for Wong's HAP contracts, Smith merely responded, "[i]t's changed . . . It's changed already." (*See id.* at 11.) At the same meeting, Smith was again referred to the Lujan matter. (*See id.* at 2.) In September 2012, this time at HUD's direction, GHURA again suspended payments on Wong's HAP contracts. (Topasna Email Oct. 3, 2012.) Subsequently, at the October 25, 2012 BOC Meeting, Smith stated he does not "own any property here in GHURA" (BOC Meeting Tr. Oct. 25, 2012), without disclosing his ongoing interests in the HAP payments (US' CSMF ¶ 68.) Even after transferring his Section 8 properties to Wong, Smith continued to act in deliberate ignorance of his status as a covered individual by ignoring GHURA's repeated concerns,

masking the full extent of his ownership interests, and still never reaching out to HUD for its interpretation and waiver.

Smith argues the Executive Director and BOC took the position that Smith was not a covered individual, creating a genuine dispute about whether Smith had the requisite knowledge of the falsity of his claims. (Smith's Opp'n 17.) Smith relies on Exhibit 114, an email sent by Executive Director Topasna on May 3, 2012 stating, in relevant part:

> With respect to Mr. Smith, the BOC's position is as follows: Mark is not a "Covered [sic] individual" as he is not an employee or contractor (subcontractor or agent) <u>who formulates policy or influences decisions with respect to the Section 8 Program.</u> What is different today than the past is that we have on contract a conflict attorney.

(Topasna Email May 3, 2012.)

However, this conclusion by Executive Director Topasna was made in reliance on Smith's half-truths. As shown by the April 30, 2012 BOC meeting that preceded this email, two BOC members discussed following up on their prior decision to "check with HUD" about Smith's conflict of interest issue because "[i]t's up to HUD and HUD will determine if it is a conflict of interest or not." (BOC Meeting Tr. April 30, 2012 12.) Chairman Sablan indicated Smith does not have a conflict because "he's already removed himself from any direct . . . relationship to his properties[.]" (*Id.*) However, a BOC member clarified that Smith has "got new ones. That's the reason why he wanted clarification. He didn't want to change the new ones, so[,]" another BOC member added, "we were going to HUD for guidance." (*Id.*) At this point, Smith injected himself into the discussion:

> "If I can interject briefly. I haven't worked with Ray [Topasna] on that, and Ray hasn't spoken to me about that because we've been preparing for [other matters]. . . . When I get back, I'll work with Ray on them, . . . and we'll see what we can do . . . I will make sure I keep enough distance from this so that Ray can get advice from other legal counsel or whatnot but I think we're just going to start off with the letter."

(*Id.* at 12–13.) The Chairman responded that with respect to the new units Smith expected to "come online[,]" following "the same approach" would suffice. (*Id.* at 13.) Smith clarified he could transfer them to an individual who does not have a conflict. (*Id.*) While the Board was correcting and clarifying the minutes for the prior BOC meeting wherein Smith disclosed his ownership interests, the BOC recognized that the purpose of Smith's divestment of the properties was so that "[h]e [would] not have to jump through all these hoops to be able to keep his position." (*See id.*; BOC Mins. April 12, 2012 16.) At the end of the April 12, 2012 BOC Meeting, BOC Chairman Sablan had directed Smith to draft a letter to HUD about his potential conflict of interest that would be prepared by Smith himself rather than conflicts counsel, whose role in relation to Smith's conflict was raised earlier. (BOC Meeting Tr. April 30, 2012 3–5.) Ultimately, the letter seeking HUD's position was never prepared by Smith. (*See* BOC Meeting Tr. Sept. 21, 2012 1–2.) A year after Smith was instructed by the BOC to submit a letter about his potential conflicts and seeking a waiver from HUD, GHURA submitted a waiver request to HUD for Smith dated April 15, 2013, supported by GHURA's legal counsel Anthony Perez's legal opinion that Smith was not a covered individual. (GHURA Waiver Req. May 2013 8–10; Perez Legal Op.) The legal opinion concluded Smith had no conflict of interest in the Section 8 Program "[a]bsent being a party to any HAP contract, and absent any evidence that Attorney Smith has any direct or indirect interest in any HAP contract or in any benefits or payments under a HAP contract." (Perez Legal Op. 5.) Perez's legal opinion fails to acknowledge that Smith was a party to HAP contracts and personally received HAP payments from April 1, 2011 to June 11, 2012; and had an impermissible interest in Wong's HAP payments from March 15, 2012 to April 1, 2013 because of Wong's use of Smith's mother as his power of attorney and Smith's "access to Wong's bank account where Section 8 moneys are deposited." (US' CSMF ¶ 74; HUD Waiver Req. 2013 4.)

For these reasons, the Court GRANTS summary judgment in favor of the United States on the issue of scienter. Smith possessed the requisite level of knowledge about the falsity of his claims beginning in July 2011.

**D. Smith's misrepresentations were material.**

Both parties move for summary judgment on the issue of materiality. Smith argues that the United States' motion is facially deficient for failing to address the materiality element. (Smith Opp'n 9.) The Government replies that its motion for summary judgment argued that Smith's misrepresentation in 2011 and 2012 asserted a "material fact," its motion cited the legal requirement of materiality, and its motion presented "definitive evidence of the conflict-of-interest requirement's materiality." (US Reply 2.)

On the merits, the United States argues that "the conflict-of-interest provision is a mandatory term for payment under the [HAP] contracts." (*Id.*) The United States cites to HUD and GHURA's general approach towards addressing conflicts of interest, in addition to the actions GHURA and HUD took when they discovered Smith's conflict specifically, as further evidence of materiality. (*Id.* at 2–3.) Smith argues that his misrepresentations were not material under *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016). In particular, Smith contends that the United States's continuing to make HAP payments even after GHURA and HUD became aware of Smith's conflict is "very strong evidence" that the conflict-of-interest provision is not material. (Smith's MSJ 13–14 (quoting *Escobar*, 579 U.S. at 195).) In spite of whatever conflict Smith may have had, he provided the rental properties contracted for. (*Id.* at 15.) For the following reasons, the Court finds that under *Escobar*'s demanding and rigorous materiality standard, there is sufficient evidence to show that Smith's violation of the conflict-of-interest prohibition was material.

**1. Legal Standard**

Under the FCA, "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). In *Escobar*, the Supreme Court specifically addressed whether "a defendant should face False Claims Act Liability only if it fails to disclose the violation of a contractual, statutory, or regulatory provision that the Government expressly designated a condition of payment." 579 U.S. at 190. The Court noted that the "materiality standard is demanding" and held that "when evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive." *Id.* at 194.

"The Supreme Court then laid out three scenarios that may help courts determine the likely or actual behavior of the government with regard to a given requirement." *Rose*, 909 F.3d at 1019.

> First, "proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." Second, the Court explained that, "if the Government pays a particular claim in full despite its *actual knowledge* that certain requirements were violated, that is very strong evidence that those requirements are not material." Third, "if the Government regularly pays a particular type of claim in full despite *actual knowledge* that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material."

*Id.* (quoting *Escobar*, 579 U.S. at 194–95).

**2. Analysis**

In *Rose*, the Ninth Circuit affirmed the district court's denial of the defendant's motion for summary judgment based on the defendant's failure to establish immateriality as a matter of law. *Id.* at 1020. At issue in *Rose* was Stephen Institute's enrollment incentive policy, which provided salary increases to admissions officers based on their student enrollment numbers. *Id.*

at 1016. The relators argued that this enrollment incentive policy violated the incentive compensation ban, a requirement of the program participation agreement Stephens Institute entered with the U.S. Department of Education. *Id.* On the issue of materiality, the Ninth Circuit summarized that "[a] reasonable trier of fact could find materiality here because the Department [of Education's] payment was conditioned on compliance with the incentive compensation ban, because of the Department's past enforcement activities, and because of the substantial size of the forbidden incentive payments." *Id.* at 1020.

Following the Ninth Circuit's materiality analysis in *Rose*, which applies the standard set forth by the Supreme Court in *Escobar*, the Court finds that Smith's violations of the conflict-of-interest provision were material to HUD's decision to make HAP payments.

**a. HAP payments were conditioned on compliance with the conflict-of-interest provision.**

First, the *Rose* court considered whether the government conditioned the payment of government funds on compliance with the requirement. *See id.* In Smith's case, it is undisputed that compliance with the HAP contracts' conflict-of-interest provision was a condition of receiving HAP payments. (*See, e.g.*, Ogo Lease and HAP Contract ¶¶ 7.b., 13.a.–b.; 24 C.F.R. § 982.161.) Had Smith or Wong not certified in their HAP contracts that they complied with the conflict-of-interest provision, they could not have been paid. (Ogo Lease and HAP Contract ¶¶ 13.a.–b.; 24 C.F.R. § 982.161.) This is probative evidence of materiality, but is not sufficient, without more, to prove materiality. *Id.*

**b. Past department actions weigh in favor of materiality.**

Next, the *Rose* court considered "the three scenarios bearing on materiality that the Supreme Court enunciated in *Escobar*, though none of them is necessarily required or dispositive." 909 F.3d at 1020–21 (citing *Escobar*, 579 U.S. at 194–95).

First, the *Rose* court considered "whether there is 'evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance' with the [requirement], because such a showing can help establish that the requirement was material." *Id.* at 1021 (quoting *Escobar*, 579 U.S. at 2003). By the same token, as its analysis of the third scenario, the *Rose* court examined "whether the Department 'regularly pays a particular type of claim in full despite *actual knowledge* that certain requirements were violated, and has signaled no change in position, [because] that is strong evidence that the requirements are not material." *Id.* (quoting *Escobar*, 579 U.S. at 2003–04).

Here, Smith was directed to the Lujan matter—a matter involving almost identical facts—on multiple occasions. In the Lujan matter, HUD wrote that Lujan was likely a covered individual and directed GHURA to terminate all of his HAP contracts in late 2007 to early 2008. (*See* Dec. 2007 Flores Letter; Mar. 2008 Flores Letter.) Although the record demonstrates that HUD received a letter from De Guzman in 2003 about Lujan's potential conflict of interest and request for a waiver (2003 De Guzman Letter), the record also demonstrates that HUD did not have *actual knowledge* of Lujan's violations until 2007, when Millie Taitano followed up with Michael Flores at HUD's Honolulu Field Office about the 2003 waiver request (*see* Jan. & Feb. 2007 HUD & GHURA Emails). Upon obtaining actual knowledge of Lujan's potential conflict in 2007, the record demonstrates HUD promptly communicated between 2007 to 2008 that Lujan was likely a covered individual, HUD would not recommend a waiver, and GHURA must terminate Lujan's remaining contracts. (*See* Mar. 2007 Flores Letter; Dec. 2007 Flores Letter; Mar. 2008 Flores Letter.) Ultimately, of the 35 HAP contracts Lujan had an interest in, HUD approved waivers for five contracts in order to allow families with school children to continue living in their unit only until July 31, 2008. (May 2008 Flores Letter.) Based on HUD's actions

with respect to the Lujan matter, there is evidence that Smith knew HUD would refuse to make HAP payments to covered individuals.

Further, GHURA staff were trained to stop all payments when a possible conflict of interest was discovered, and to ultimately terminate the HAP contract if the conflict was confirmed. (US' CSMF ¶ 4; Cr. Trial Tr. Day 4, 188–90, ECF No. 124-23.) Indeed, on multiple occasions, HUD and GHURA enforced the conflict-of-interest provision as applied to the different classes of covered individuals defined in the regulations. (*See, e.g.*, BOC Mins. May 8, 2003 7 (Oscar Calvo's disclosure of potential COI BOC's directive to seek HUD waiver), 10 (David Lujan's letter re: COI in CFR and HAP Contract, BOC's directive to seek HUD waiver); 2003 De Guzman Letter to HUD (seeking review and waiver for three individuals, including Calvo and Lujan).) As to Smith himself, there are multiple instances in which payments were stopped whenever a conflict situation was clearly identified by GHURA staff or HUD. Based on these facts, an analysis of the first and third scenarios weigh in favor of materiality.

The *Rose* court also considered "whether the Department has paid 'a particular claim in full despite its *actual knowledge* that' the [requirement] was violated, because 'that is very strong evidence that the [requirement] not material.'" *See* 909 F.3d at 1021 (quoting *Escobar*, 579 U.S. at 2003). The *Rose* court did not analyze this factor because there was no evidence that the Department had actual knowledge that the Defendant was violating the incentive compensation ban. *Id.* Here, Smith argues his conflict was immaterial because HUD was aware of his potential conflict in September 2012, and HUD was further aware of GHURA's release of payments on the contracts in December 2012. (Smith's MSJ 14.)

Though the Court largely agrees with Smith's characterization of these facts, the Court notes further details that command the conclusion that the conflict was material. In September 2012, GHURA Section 8 Administrator Norma San Nicolas informed HUD that Smith was

GHURA's current legal counsel and that she believed a conflict existed. (Kaoholokula Email Sept. 19, 2012.) On September 20, 2012, HUD reminded GHURA that the BOC "is not empowered to waive the conflict of interest provisions," HUD may require GHURA to repay all funds that were paid to an ineligible property owner, that any conflict of interest "must stop immediately[,]" and demanded that GHURA submit an accounting of HAP contracts for conflicted individuals within 14 days. (Flores Email Sept. 20, 2012.) In response, GHURA suspended payments to Wong that same day at the direction of Executive Director Topasna. (Topasna Email Oct. 3, 2012 42.) After further communications between GHURA and HUD, on October 3, 2012, Director Topasna provided records regarding Wong and Smith's potential conflicts to HUD; the records included a list of HAP payments made to Wong and Smith and a copy of the 2011 quitclaim deed. (*Id. at* 1, 3–27, 28–31.) After Topasna's forced resignation as Executive Director in November 2012, GHURA's new Executive Director, Mike Duenas, instructed staff to release HAP payments to Wong while awaiting HUD's determination on the conflict issue based on the order of the BOC at its meeting on November 9 [sic], 2012. (Duenas Emails Dec. 2012 1.) Neither the November 8, 2012 meeting minutes nor transcript reflect that the BOC ordered the release of payments to Wong. (*See* BOC Mins. Nov. 8, 2012; BOC Meeting Tr. Nov. 8, 2012.) On December 28, 2012, HUD emailed Director Duenas, relaying the concerns of HUD's Regional Administrator that Wong's "contracts continue to receive money without this matter coming to a head." (Flores Email Dec. 28, 2012.) This notice to GHURA expressed HUD's concerns about GHURA's decision to reinstate payments without the critical determination by HUD of whether Smith had a conflict of interest; and if so, whether HUD would waive it.

Despite the ongoing payments on Wong's HAP contracts, HUD's actions sufficiently demonstrated materiality. First, though HUD became aware of a potential conflict and received

a copy of the 2011 quitclaim deed in late 2012, HUD did not obtain *actual knowledge* that a violation of the conflict-of-interest provision had occurred based on the undisclosed land documents related to Smith's quitclaim deeds to Wong. *See id.* The record is unclear as to when HUD gained actual knowledge of their existence; nevertheless, what is apparent is that as of May 2, 2013, the Field Office recommended to HUD headquarters a denial of Smith's waiver request based on Smith's mother having the power of attorney to manage the Section 8 units, Wong operating his landlord business through Smith's law office, and Smith having access to Wong's bank account where Section 8 monies were deposited. (HUD Waiver Req. 2013 4.) The Court also notes HUD's DEC report issued in 2015, which came after Smith's 2013 resignation and the twelve-month period thereafter, did not reference any of Smith's property transfer documents related to the quitclaim deeds. Further, although the payments on Wong's contracts continued, the *Rose* court explained that the Government "can demonstrate that requirements . . . are material without directly limiting, suspending, or terminating" payments. *See id.* Here, HUD's immediate directive in 2012 to GHURA to stop any conflict, demand for accounting within 14 days, and advisement that GHURA may be required to repay all funds that were paid to an ineligible property owner, sufficiently demonstrate that Smith's violation of the conflict-of-interest provision was material.

**c. The magnitude of Smith's violation was substantial.**

Lastly, the *Rose* court considered whether the noncompliance was "minor or insubstantial[,]" as the Supreme Court did in *Escobar*. *Rose*, 909 F.3d at 1022. "For instance, were a school to offer admissions representatives cups of coffee or $10 gift cards for recruiting higher number of students, there would be no viable claim under the False Claims Act." *Id.* The *Rose* court found the noncompliance to be significant, based on awards of over $20,000 to admissions representatives who met their enrollment goals. *Id.*

Here, Smith's noncompliance was not "minor or insubstantial." He received notice on multiple occasions about his potential noncompliance; he represented he would take corrective action; and the duration of his noncompliance lasted for years. Further, Smith took steps to conceal his interests in HAP payments by transferring titular ownership of properties to Wong, all the while holding a financial interest in those properties as the mortgagee and holding a "reverse" quitclaim deed as collateral. Lastly, Smith's noncompliance led to the distribution of a significant amount in federal funds—over $375,000 in HAP payments. (*See* US' MSJ 5.)

**E. Smith knew that his violations were material.**

In addition to knowledge of falsity, Smith argues that knowledge of materiality is required for an FCA violation. In *Kinetic Concepts*, the Ninth Circuit noted it would not decide the question of whether knowledge of materiality is a requirement for FCA liability, given that the record established a triable issue regarding the defendant's knowledge of materiality in that case. 44 F.4th at 851.

Assuming knowledge of materiality is required, it was present in this case: Smith knew that a violation of the conflict-of-interest provision would be material to payment. Again, in July 2011, Director Camacho told Smith that he must seek a waiver of the potential conflict, unless he determined he would transfer his ownership interests in the rental properties. (Smith's Debarment Resp. 135.) Smith responded by informing Director Camacho he would transfer his ownership interests. (*Id.*) Smith's response is evidence that he knew a violation of the conflict-of-interest provision would be material to payments on the HAP contracts. Further, payments on Smith and Wong's HAP contracts were actually withheld on multiple occasions, when GHURA suspected a potential conflict. (*See* GHURA Emails re: Feb. & April 2012 Payments.) At the April 12, 2012 BOC Meeting, the BOC Chairman directly raised the issue of Smith being listed on the bank account for Wong's HAP contracts to him. (BOC Meeting Tr. April 12, 2012 11.)

During that meeting, Smith expressed skepticism towards whether or not he is a covered individual, but there is no statement indicating he did not know covered individuals would be prohibited from receiving HAP payments. Similarly, after GHURA suspended payments on Wong's HAP contracts at HUD's direction in September 2012 (Topasna Email Oct. 3, 2012), Smith insisted at the October 25, 2012 BOC Meeting that he does not have a conflict without ever fully disclosing all his interests in the HAP contracts with Wong as directed by the Board in April 2012. Even when GHURA's conflict counsel submitted his legal opinion in April 2013 (Perez Legal Op.), a month before Smith resigned, it is apparent that Smith still did not disclose all his interest because the legal opinion relied on his representation that he no longer had any interest in the rental properties. The land documents related to the two quitclaim deeds to Wong were not disclosed to GHURA's Board until 24 hours prior to his resignation. And as noted previously, the record does not show if and when this disclosure was ever made by GHURA or Smith to HUD.

Based on these facts, the Court finds it is undisputed that Smith knew that a violation of the conflict-of-interest provision was material to payment on the HAP contracts, and the Court GRANTS summary judgment in favor of the United States on this issue.

**F. Causing the Government to Pay Money**

It is undisputed that the submission of claims—which Smith either presented directly or caused Wong to present (*see* US' MSJ 37)—in turn caused the Government to pay him and Wong. Smith responds by noting that all of the rental properties and legal services paid for that are the subject of the complaint were in fact provided. (Smith Opp'n 9.) Based on these facts, the Court GRANTS summary judgment in favor of the United States on this issue.

//

//

## G. Conspiracy

HUD argues that "Smith and Wong twice conspired to commit violations" of the FCA, based on their two property transfer schemes in 2011 and 2012. (US' MSJ 38.) Smith moves for summary judgment on the conspiracy claims because the Government did not file its claims until September 2019, beyond the six-year statute of limitations under 31 U.S.C. § 3731. (Smith's MSJ 17.) The Government argues that under the same statutory provision, the conspiracy claims in its intervening complaint relate back to the relator's complaint and thus fall within the statute of limitations. (US' Opp'n 17.) Smith replies that the relator's complaint did not allege conspiracy. (Smith's Reply 10.)

### 1. Legal Standard

The elements of a FCA conspiracy claim are "(1) that the defendant knowingly conspires with one or more persons to get a claim paid, (2) that one or more of the conspirators perform any act to effect the objects of the conspiracy, and (3) that United States suffers damages as a result of the fraudulent claim." 15A C.J.S. Conspiracy § 52 (citing cases).

Under 31 U.S.C. § 3731(b), an FCA civil action may not be brought more than six years after the date on which the violation occurred. Section 3731(c) addresses the statute of limitations in actions where the Government elects to intervene:

> If the Government elects to intervene and proceed with an action brought under 3730(b), the Government may file its own complaint or amend the complaint of a person who has brought an action under section 3730(b) to clarify or add detail to the claims in which the Government is intervening and to add any additional claims with respect to which the Government contends it is entitled to relief. For statute of limitations purposes, any such Government pleading shall relate back to the filing date of the complaint of the person who originally brought the action, to the extent that the claim of the Government arises out of the conduct, transactions, or occurrences set forth, or attempted to be set forth, in the prior complaint of that person.

//

//

**2. The United States' conspiracy claims were filed within the statute of limitations because they relate back to the filing of the relator complaint.**

Here, Topasna's relator complaint, filed on November 6, 2015, alleged that "[f]or the time period from March 2011 through November 8, 2012, Defendant SMITH was receiving payments as a landlord, via the Federal Section 8 program in violation of Federal regulations." (Topasna Compl. 5.) The relator complaint sought:

> the full recovery of all federal monies paid to Defendant SMITH by Defendant GHURA during such time as Defendant SMITH was legal counsel for Defendant GHURA to include both the monies he was paid for his work as legal counsel and as a landlord through the Section 8 low income housing program.

(*Id.* at 11.) The relator complaint did not mention Wong, the property transfers, or allege any conspiracy claims.

However, the conspiracy claims alleged in the United States' complaint in intervention (US Compl.), relate back because the relator complaint concerns Smith's receipt of payments between March 2011 to November 2012, and the Government's conspiracy claims are based on the property title transfers that occurred in November 2011 and August 2012. Furthermore, the original complaint sought to recover all federal monies paid to Smith during the time he was legal counsel for GHURA, which lasted until April 2013, and HAP payments continued through May 2014. Thus, the conspiracy claims likely "arise[] out of the conduct, transactions, or occurrences set forth, or attempted to be set forth" in Topasna's relator complaint, and were properly added as "additional claims." *See* 31 U.S.C. § 3731(c); *United States ex rel. Mei Ling v. City of Los Angeles*, No. CV 11-974 PSG (JCX), 2018 WL 3814498, at *23 (C.D. Cal. July 25, 2018) ("because Relators filed their original complaint on February 1, 2011, the Government's FCA claims relate back to that date"); *see also United States ex rel. Duntsch v. Superior Care Pharmacy*, No. 18-CV-1002-MMA-MSB, 2025 WL 108188, at *5 (S.D. Cal. Jan.

15, 2025) (factual basis underlying claims was set forth in Relator's complaint). For these reasons, Smith's motion is denied.

**3. Smith and Wong conspired to violate the FCA on two separate occasions.**

Smith transferred his titular ownership of his Section 8 rental properties to Wong in November 2011 and August 2012. (US' CSMF ¶¶ 35, 49; Quitclaim Deed 2011; Recording & Quitclaim Deed 2012.) At the same time both quitclaim deeds were executed, Smith and Wong also executed other property transfer agreements, such as purchase agreements, promissory notes, and mortgages. (Purchase Agreement 2011; Purchase Agreement 2012; Promissory Note 2011; Promissory Note 2012; Mortgage 2011; Mortgage 2012.) However, on both occasions, Smith and Wong only submitted the quitclaim deeds to GHURA, withholding the other property transfer documents. (*See* US' CSMF ¶¶ 35, 49–50.) Indeed, it was not until 2015 that Smith and Wong attempted to rectify their earlier failings to properly record all the property transfer agreements. (*Id.* at ¶ 57.) Moreover, Smith only recorded the replacement mortgage for the 2012 transaction in 2021, nine years after the document was executed. (*Id.* at ¶ 59.)

The actions of Smith indicate that he knowingly conspired with Wong to ensure he continued receiving payments on his HAP contracts. The execution of the six separate property transfer documents were acts that caused GHURA to continue paying Wong for Smith's HAP contracts because it appeared—from the information Smith selectively provided to GHURA—that the conflict of interest had been resolved. As a result of these acts, GHURA continued to issue payments on the HAP contracts, causing the United States to suffer damages. *See* 15A C.J.S. Conspiracy § 52.

Based on the above facts, Smith is liable for conspiring to commit violations of the FCA on two separate occasions. Accordingly, the Court GRANTS summary judgment in favor of the United States on this claim.

**H. Unjust Enrichment**

Smith moves for summary judgment on the unjust enrichment claim, advancing three primary arguments: 1) a claim of unjust enrichment is not permissible in an FCA complaint because the FCA provides comprehensive procedures for the enforcement of remedies; 2) the claim is barred by the statute of limitations; and 3) Smith was not unjustly enriched because he provided the rental properties for which he was paid. (Smith's MSJ 18–19; Smith's Reply 11.) In its opposition, the Government argues that the unjust enrichment claim "is not an attempt to graft a common law claim *into the FCA*, but rather is a standalone claim in the alternative based on common law;" 2) the claim is within the statute of limitations because it relates back to the filing date of the relator complaint; and 3) Smith was unjustly enriched because he received the payments as a result of his "massive deceit." (US' Opp'n 19–20.) Further, the Government clarifies that this unjust enrichment claim "is pled in the alternative," and that the Government is not seeking summary judgment on this claim. (*Id.* at 18 n.20.) The Court addresses each of Smith's arguments in turn.

The Court rejects Smith's first argument. An unjust enrichment claim is available to the United States and is not necessarily derivative of False Claims Act claims. *United States ex rel. Radhakrishnan v. Gampel*, No. CV-20-00176-PHX-GMS, 2024 WL 894671, at *4 (D. Ariz. Mar. 1, 2024) (citing *United States v. Mead*, 426 F.2d 118, 124 (9th Cir. 1970)). "Thus, the Government could bring . . . an unjust enrichment claim against Defendant[] totally separate of the False Claims Act claims because 'no statute is to be construed as altering the common law further than its words import.'" *Id.* (citing *Mead*, 426 F.2d at 124).

The Court further rejects Smith's second argument. The statute of limitations for a federal unjust enrichment claim is six years under 28 U.S.C. § 2415, *Mei Ling*, 2018 WL 3814498, at *34, not five years under 28 U.S.C. § 2462 as argued by Smith. Smith's reliance on *Kokesh v.*

*S.E.C.*, 581 U.S. 455 (2017) is inapposite. In *Kokesh*, the Supreme Court found that disgorgement of profits in the securities law context constitutes a "penalty" within the meaning of 28 U.S.C. § 2462 and is subject to the five-year statute of limitations. Here, the United States' unjust enrichment claim seeks to recover the amount of payments made to Smith and Wong, not any profits, assessments, or penalties. (*See* US' Opp'n 20.) Thus, the six-year statute of limitations applies, and the United States' complaint was timely filed on September 11, 2019, given that the last payment alleged in the complaint occurred on May 2, 2014 (*see* Smith's MSJ 18.) Further, as the United States argues, non-FCA common law claims—such as unjust enrichment—likely relate back to the filing of the original relator complaint. *See Duntsch*, 2025 WL 108188, at *4; *United States ex rel. Jordan v. Northrop Grumman Corp.*, No. CV 95-2985 ABC (EX), 2002 WL 35628747, at *6 n.1 (C.D. Cal. Aug. 5, 2002); *United States ex. rel Serrano v. Oaks Diagnostics, Inc.*, No. CV 03-2131 RSWL (RCX), 2008 WL 11638828, at *1 (C.D. Cal. Dec. 3, 2008).

Finally, the Court rejects the merits of Smith's third argument that because he provided the rental properties for which he was paid, he was not unjustly enriched. This argument is related to the issues of falsity and materiality—whether Smith was a covered individual and if so, whether his false claims that he was not a covered individual were material to United States' decision to make payments. Smith argues that the United States "is not entitled to 'restitution' because it received the benefits of the properties that were paid for," citing criminal cases involving restitution orders in support. (Smith's MSJ 19; Smith's Reply 11.) However, because the Court finds in favor of the United States on the issues of falsity and materiality, the Court concludes the United States did not obtain the benefit of its bargain. *Cf. U.S. ex rel. Humane Soc. of U.S. v. Hallmark Meat Packing Co.*, No. EDCV 08-00221-VAP, 2013 WL 5753784, at *18 (C.D. Cal. Apr. 30, 2013) (denying defendant summary judgment because evidence raised triable

issue that facility was ineligible to contract with United States because of purported involvement of convicted felon—which was not disclosed by facility, entitling United States to recover full contract price). For these reasons, Smith's motion is denied.

## VI. DAMAGES AND PENALTIES

The United States seeks treble damages—three times the amount of HAP payments and legal fees HUD paid—for 40 HAP payments from April 2011 to May 2014 when Smith was serving as GHURA's legal counsel plus the one year after his resignation, and seven legal fee payments. (US' MSJ 5, 39; *see* 31 U.S.C. § 3729(a).) HUD paid $378,873 for the HAP contracts and $197,777 in attorney's fees—a total amount of $576,650, which amounts to treble damages of $1,729,950. (*Id.* at 5, 39.) Smith opposes, arguing that the Government did not suffer any legally cognizable damages under the FCA and *Hendrix*, as GHURA received the rental units and legal services that were paid for. (Smith's Opp'n 17–18.) The Government replies that "[t]he amount of damages includes the amount of illegal payments[,]" also citing *Hendrix* for support. (US' Reply 11.) The Government also seeks maximum penalties—$11,000 for each of the 47 false claims and two conspiracies in this case—for a total penalty of $539,000. (US' MSJ 39; *see also* 28 C.F.R. § 85.3(a)(9) (adjusting the penalty amounts pursuant to the Federal Civil Penalties Inflation Act of 1990).) Smith argues that the penalty should be capped at $60,000 under *Hendrix*—$10,000 per project—considering there were five properties and one legal services project. (Smith Opp'n 18–19.) For the following reasons, the Court agrees in part with both parties as discussed below.

### A. Applicable Law

A defendant is liable for false claims regardless of whether the claim is paid. *See* 31 U.S.C. § 3801(b)(2). When the United States is "legally barred from paying anything" for the claim, "the damages include the entire amount paid even if the defendant provided a valuable

product or service." *See Hendrix*, 76 F.4th at 1174 (citing *United States v. Mackby*, 339 F.3d 1013, 1017–19 (9th Cir. 2003)). Under the FCA, the Government is entitled to treble damages it sustains because of the fraud. *See* 31 U.S.C. § 3729(a). The Government may also seek civil penalties ranging from $5,500 to $11,000 per claim. *See id.*; 28 U.S.C. § 85.3(a)(9) (increasing the civil penalty amount to consider inflation). The FCA "impose[s] a penalty for each *act* in violation of the statute." *Hendrix*, 76 F.4th at 1172 (emphasis in original). The size of the penalty must not be "grossly disproportional" to the level of culpability and harm caused. *Mackby*, 339 F.3d at 1017.

**B. The United States is entitled to treble damages for HAP payments only.**

Having previously concluded that the United Stated did not establish its FCA claim for Smith's legal fee payments (*see supra* § V.B.4), the Court will examine damages for the HAP contracts only, limited to the thirty-five (35) payments made starting from August 1, 2011,[4] which is the earliest of when the United States established Smith gained knowledge of the impermissible conflict of interest (*see supra* § V.C.2.), to May 2014, a year after Smith resigned as legal counsel in April 2013. The thirty-five payments total $345,382, which amounts to treble damages in the amount of $1,036,146. (*See* Smith Check Register, ECF No. 124-1; GHURA Payment Register, ECF No. 124-83; Wong Check Register, ECF No. 124-167; GHURA Check Register, ECF No. 124-169.)

In *Hendrix*, a *qui tam* action under the False Claims Act involving allegations that the defendant falsely represented its polyvinyl chloride ("PVC") pipes were compliant with industry standards, the district court granted the defendant judgment as a matter of law on actual damages

---

[4] The Court found Smith liable for only the HAP payments after he had knowledge of the conflict of interest. (*See supra* § V.) As such, the Court does not include the HAP payments from April 2011 to July 2011 in its damages calculations.

and awarded one statutory penalty for each project. 76 F.4th at 1167. On the issue of damages, the district court found that plaintiffs were not entitled to the full purchase price of the pipe because there was insufficient evidence that the received pipe was less valuable than compliant pipe considering the plaintiffs never removed, replaced, or ceased use of the received pipe. *Id.* at 1171. The Ninth Circuit affirmed, distinguishing cases which properly awarded the contract price as actual damages because "the goods were either plainly unusable, not used, or returned." *Id.* at 1174. The Ninth Circuit also distinguished *Mackby*, 339 F.3d 1013—relied upon here by the Government—where the contract price for services provided was the proper measure of damages because "the United States was legally barred from paying anything for his service." *Hendrix*, 76 F.3d at 1174. In *Mackby*, on the appellant's challenge under the Excess Fines Clause of the Eighth Amendment, the Ninth Circuit affirmed the district court's award of treble damages based on 1,459 false claims, which were Medicare payments for physical therapy services the Government made under the belief that the services were being provided under the supervision of a certified therapist, as required by federal regulation. *See Mackby*, 339 F.3d at 1014–15.

Smith argues that the regulation at issue in *Mackby* is distinguishable from this case because "the regulation at issue here explicitly states that it was waivable." (Smith's Reply 10.) Although Smith is correct that the regulation that prohibits the payment of rent in a HAP contract may be waived by HUD, he never obtained that waiver; therefore, HUD and GHURA were legally barred from paying anything for those HAP rental contracts that violated the regulation. *See* 24 C.F.R. § 982.161(c) ("The conflict of interest prohibition under this section *may be waived* by the HUD field office for good cause" (emphasis added)); *cf. Hendrix*, 76 F.4th at 1175 (stating that the plaintiffs were not legally constrained from paying for the non-compliant pipe). GHURA belatedly sought a waiver for Smith in April 2013 after *HUD* insisted on the submission even after Smith had already resigned because of the additional one-year prohibition. This

request was submitted after Smith served as legal counsel for GHURA for over two years and represented to the Board on multiple occasions that he did not have a conflict of interest. Even after a waiver was sought from HUD, Smith did not fully disclose all the pertinent information for the waiver. (Perez Legal Op.; *see also supra* § V.E.) Had Smith been "truthful," either upon discovery of the conflict or when seeking a waiver from HUD, "the government would have known that he was entitled to nothing." *Mackby*, 339 F.3d at 1019; *see also Ellis v. Zheng*, 799 F. App'x 551, 552 (9th Cir. 2020) ("Because the FCA is concerned with fraud on the *government*, damages are determined . . . by how much Zheng overcharged the government" (emphasis in original)). As such, an explicit condition for payments on the HAP contracts was not waived, and the government was barred from making payments on the HAP contracts. *Mackby*, 339 F.3d at 1017, 1019.

Here, awarding treble damages is justified, considering the egregiousness of Smith's conduct. As previously discussed, Smith, while acting as GHURA's legal counsel, revised the conflict of interest form and signed it himself, (BOC Mins. Feb. 21, 2012 3; Smith's COI Discl. April 2012); he repeatedly represented he did not have a conflict of interest; and he failed to properly disclose to HUD the land documents relevant to his conflict of interest until years after his tenure as GHURA's legal counsel (US CSMF ¶¶ 59, 80). As late as May 2017, in a related criminal proceeding, Wong represented to the court that he owned the property involved in the 2012 transfer "free and clear," but did not disclose the replacement mortgage executed in December 2015. (US' CSMF ¶ 80.) In June 2021, shortly after Wong passed away, Smith recorded the replacement mortgage for the 2012 transaction. (US' CSMF ¶ 59.) Considering the egregious conduct that involved multiple people and spanned years of concealment, a treble damages award is not grossly disproportional to Smith's level of culpability and the harm caused,

particularly after he knew there was a conflict of interest and HUD would not authorize any HAP payment had it been aware of all the details. *See Mackby*, 339 F.3d at 1017.

Accordingly, the Court awards the United States treble damages for thirty-five HAP payments that were made between July 2011 and May 2014 in the amount of $1,036,146.[5]

**C. The United States may collect penalties on each HAP payment from after July 2011 to May 2014.**

In *Hendrix*, the Ninth Circuit affirmed the district court's award of one statutory penalty for each of the twenty-six water and sewer projects at issue, rather than for each non-compliant pipe the plaintiffs received. *Hendrix*, 76 F.4th at 1172–73. The Ninth Circuit explained that "when determining penalties for false claims associated with goods, courts applying the federal FCA have awarded penalties based on the number of contracts or invoices but not on each good." *Id.* at 1173 (internal citations omitted)). In *Mackby*, the Ninth Circuit affirmed the district court's award of the minimum statutory penalty for 111 claims for Medicare payments—representing one claim per beneficiary per year that was served. 339 F.3d at 1015. Here, the Court awards the United States a penalty for each HAP payment issued for Smith and Wong starting in July 2011.

Smith or Wong entered into seven HAP contracts after Smith knew of the conflict of interest in July 2011. (*See* CS 002–3, 5, 7, 11, 19–20, ECF Nos. 124-2, 124-3, 124-5, 124-7, 124-11, 124-19, 124-20 (HAP Contracts).) Twelve of the HAP contracts predate the discovery of the conflict. (*See* CS 005, 6, 8–10, 13–18, ECF Nos. 124-6, 124-6, 124-8–124-10, 124-13–18 (HAP Contracts).) At the inception of the twelve contracts that predate July 2011, there was no violation of the FCA. During the life of the contract, however, the Government has sufficiently proven there was a conflict and the contracts needed to be terminated immediately. (*See, e.g.*,

[5] The Court's damages calculation is set forth in the attached spreadsheet as an exhibit that is incorporated into this Decision & Order.

Ogo Lease and HAP Contract ¶¶ 7.b., 13.a.–b.) Because the contracts were not immediately terminated and the conflict of interest was not removed, each payment *after* the conflict of interest was discovered was a violation of the FCA, incurring a penalty. Considering the Ninth Circuit's reasoning in both *Mackby* and *Hendrix*, the Court finds that Smith is liable for 35 violations of the FCA, for each time he or Wong received a payment after Smith knew of the conflict of interest.

Smith argued that the Government is entitled to collect only six total penalties—one for each *property* alleged in the complaint, totaling five, and one for the legal fees. (Smith MSJ 17 (citing *Hendrix*, 76 F.4th at 1172–73).) Setting aside the legal fee penalty, the Court rejects Smith's contention. The FCA imposes a penalty for each false claim for payment. 31 U.S.C. § 3729(a)(1). Upon a plain reading of the statute, it could indicate that each payment *per* contract *per* month could amount to a false claim for payment. *See, e.g.*, *Hendrix*, 76 F.4th at 1172–73 (discussing cases in which the number of claims was based on number of invoices or contracts, not for each invoice or good provided). Here, each of the payments made by GHURA was to pay for all the rental units provided by Smith or Wong for that month. For example, GHURA's Landlord Statement-Section 8 Voucher Program, dated August 1, 2012, and sent to Wong at Smith's Law Office, advised Wong that $9,872 was deposited in payment for the ten tenants identified by name. (GHURA Statement 2.) Considering the Government issued only one payment per month, the Court finds that each payment after Smith knew of the conflict of interest constituted a violation of the FCA, incurring a civil penalty.

As such, civil penalties are being awarded for a total of 35 payments on contracts that were not terminated upon the discovery of the conflict of interest and on contracts where the conflict was not removed. The Government is also entitled to civil penalties for the two conspiracy claims on which they prevailed (*see supra* § V.G.) for a total of 37 civil penalties,

each in the amount of $11,000. Accordingly, the Court awards the United States civil penalties for 37 violations of the FCA from July 2011 to May 2014 in the amount of $407,000.

## VII. CONCLUSION

For the foregoing reasons, the Court grants partial summary judgment in favor of the United States in its False Claims Act causes of action against Smith for Smith's violation of the conflict of interest prohibition regulation governing the Section 8 Housing Voucher Program during his two year tenure as GHURA's legal counsel plus an additional 12 months thereafter. In particular, the Court concludes the United States has proven $345,382 in damages for the period from August 1, 2011 through May 1, 2014, and therefore is awarded $1,306,146 in treble damages plus $407,000 in civil penalty, for a total amount of $1,443,146.[6] Given the Court's calculation, the United States is directed to submit within thirty-days of this order an accounting of the applicable pre- and post-judgment interest, as well as costs.

Furthermore, the Court denies the United States' motion for summary judgment in its False Claims Act causes of action against Smith from April 2011 to July 2011 because the element of scienter is disputed. This issue remains to be proven at trial.

Finally, the Court denies the United States' motion for summary judgment in its claim to recover legal fees that Smith charged GHURA while acting as GHURA's legal counsel based on an alleged conflict of interest defined by regulation.

As for Smith's motion for summary judgment, the Court denies the motion as to the United States' FCA claims and the alternative claim of unjust enrichment.

---

[6] In its Opposition to Smith's Motion for Summary Judgment, the Government indicated it would credit any amounts paid under the PFCRA judgment (*see* ALJ Order *in* case number 1:25-cv-00016). (US' Opp'n 6–7 n.7.) The Government provided a singular example based on one of the PFCRA claims, indicating it would seek only the difference between the FCA and PFCRA penalty as well as the difference between the PFCRA assessment and the FCA treble damages amount. (*Id.*)

IT IS SO ORDERED this 30th day of September, 2026.

RAMONA V. MANGLONA
District Judge

United States of America ex rel. Ray Sanchez Topasna v. Mark S. Smith
1:15-cv-00040

**Exhibit A**

| US Claim # | Court Award # | Pmt # | Recipient | Date of GHURA Stmt | GHURA HAP Pmt Amt | Treble Damages Amt | Penalty Amt |
|---|---|---|---|---|---|---|---|
| 1 | | 1 | | 4/1/2011 | $0 | $0 | N/A |
| 2 | | 2 | | 5/1/2011 | $0 | $0 | N/A |
| 3 | | 3 | | 5/15/2011 | $0 | $0 | N/A |
| 4 | | 4 | | 6/1/2011 | $0 | $0 | N/A |
| 5 | | 5 | | 7/1/2011 | $0 | $0 | N/A |
| 6 | 1 | 6 | Smith | 8/1/2011 | $9,350 | $28,050 | $11,000 |
| 7 | 2 | 7 | Smith | 8/15/2011 | $1,692 | $5,076 | $11,000 |
| | | | Adjustment* | 9/1/2011 | ($976) | ($2,928) | |
| 8 | 3 | 8 | Smith | 9/1/2011 | $15,025 | $45,075 | $11,000 |
| 9 | 4 | 9 | Smith | 10/1/2011 | $10,446 | $31,338 | $11,000 |
| 10 | 5 | 10 | Smith | 10/14/2011 | $918 | $2,754 | $11,000 |
| 11 | 6 | 11 | Smith | 11/1/2011 | $7,301 | $21,903 | $11,000 |
| 12 | 7 | 12 | Smith | 12/1/2011 | $10,602 | $31,806 | $11,000 |
| 13 | 8 | 13 | Smith | 1/1/2012 | $9,840 | $29,520 | $11,000 |
| 14 | 9 | 14 | Smith | 6/1/2012 | $62 | $186 | $11,000 |
| 15 | 10 | 1 | Wong | 3/15/2012 | $10,816 | $32,448 | $11,000 |
| 16 | 11 | 2 | Wong | 4/1/2012 | $4,155 | $12,465 | $11,000 |
| 17 | 12 | 3 | Wong | 5/1/2012 | $2,997 | $8,991 | $11,000 |
| 18 | 13 | 4 | Wong | 6/1/2012 | $33,461 | $100,383 | $11,000 |
| 19 | 14 | 5 | Wong | 6/15/2012 | $1,525 | $4,575 | $11,000 |
| 20 | 15 | 6 | Wong | 7/1/2012 | $9,872 | $29,616 | $11,000 |
| 21 | 16 | 7 | Wong | 8/1/2012 | $9,872 | $29,616 | $11,000 |
| 22 | 17 | 8 | Wong | 9/1/2012 | $10,864 | $32,592 | $11,000 |
| 23 | 18 | 9 | Wong | 12/14/2012 | $34,913 | $104,739 | $11,000 |
| 24 | 19 | 10 | Wong | 1/1/2013 | $11,835 | $35,505 | $11,000 |
| 25 | 20 | 11 | Wong | 2/1/2013 | $11,835 | $35,505 | $11,000 |
| 26 | 21 | 12 | Wong | 3/1/2013 | $10,690 | $32,070 | $11,000 |
| 27 | 22 | 13 | Wong | 4/1/2013 | $10,668 | $32,004 | $11,000 |
| 28 | 23 | 14 | Wong | 5/1/2013 | $10,668 | $32,004 | $11,000 |
| 29 | 24 | 15 | Wong | 6/1/2013 | $10,360 | $31,080 | $11,000 |
| 30 | 25 | 16 | Wong | 7/1/2013 | $11,534 | $34,602 | $11,000 |
| 31 | 26 | 17 | Wong | 8/1/2013 | $9,455 | $28,365 | $11,000 |
| 32 | 27 | 18 | Wong | 9/1/2013 | $6,426 | $19,278 | $11,000 |
| 33 | 28 | 19 | Wong | 10/1/2013 | $11,972 | $35,916 | $11,000 |
| 34 | 29 | 20 | Wong | 11/1/2013 | $9,420 | $28,260 | $11,000 |
| 35 | 30 | 21 | Wong | 12/1/2013 | $9,258 | $27,774 | $11,000 |
| 36 | 31 | 22 | Wong | 1/1/2014 | $8,668 | $26,004 | $11,000 |
| 37 | 32 | 23 | Wong | 2/1/2014 | $7,091 | $21,273 | $11,000 |
| 38 | 33 | 24 | Wong | 3/1/2014 | $7,091 | $21,273 | $11,000 |
| 39 | 34 | 25 | Wong | 4/1/2014 | $7,838 | $23,514 | $11,000 |
| 40 | 35 | 26 | Wong | 5/1/2014 | $7,838 | $23,514 | $11,000 |
| | | | | | | | |
| 41, 42 | 36, 37 | Conspiracy Claims (2 counts) | | | | | $22,000 |
| | | | | | | | |
| | | | | | | | |
| | | Total (Aug. 2011 through May 2014) | | | $345,382 | $1,036,146 | $407,000 |
| | | | | | | | |
| | | TOTAL (damages plus penalties): | | | | | $1,443,146 |

*The Court's calculation is an adoption of the United States' presentation of figures, less the period denied. (*See* US' MSJ 5 n.1.)